IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA TOLBERT | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:11-CV-00107 |
| | § | |
| RBC CAPITAL MARKETS | § | |
| CORPORATION N/K/A RBC CAPITAL | § | |
| MARKETS, LLC; RBC CENTURA | § | |
| BANK N/K/A RBC BANK (USA); | § | |
| RBC U. S. INSURANCE SERVICES, INC. | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

### I.  THE PARTIES

1.      Plaintiff, Brenda Tolbert is a citizen of Texas residing in Houston, who worked for RBC Wealth Management, a division of and/or assumed name of RBC Capital Markets Corporation, and who (with minor exceptions) was employed by it or its predecessors from December of 1971 until August 2009.

2.      Defendant, RBC Capital Markets Corporation ("RBC Capital) n/k/a RBC Capital Markets, LLC, is a foreign corporation authorized to do business and doing business in Texas and has appeared in this case.

3.      Defendant, RBC Centura Bank n/k/a RBC Bank (USA) ("RBC Centura"), is a foreign corporation authorized to do business and doing business in Texas and has appeared in this case.

4.      Defendant, RBC U. S. Insurance Services, Inc. ("RBC Insurance"), is a foreign corporation authorized to do business and doing business in Texas and has appeared in this case.

5.     Defendants sponsor the employee pension benefit plan at issue in this case.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction of the subject matter of this complaint and action under 28 U.S.C. §1331 and 29 U.S.C. §1132(e)(1). Based on information and belief derived from information in Defendant's documents, the amount in controversy for the Plaintiff Class is in the tens of millions of dollars.

7.     Venue is proper under 28 U.S.C. §1391(b, c) and 29 U.S.C. § 1132(e)(2) because RBCCM owns and operates offices in Houston, Harris County, Texas, Defendants' acts and omissions and the events giving rise to these claims occurred in this division, and the WAP (as defined below) has and continues to cover individuals residing in the Southern District of Texas.

## III.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

8.     Pursuant to Rules 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, Tolbert brings this action on behalf of all persons who—within the last four years—have or had at least five years of service with RBC (as defined below); are current or former employees of Defendant(s); and were participants in the WAP or who are personal representatives for or beneficiaries of any such person who is deceased (the "Plaintiff Class").

**A.     This Case Meets All Rule 23(a) Prerequisites.**

9.     Prosecution of the claims of the Plaintiff Class is appropriate because the prerequisites of Rule 23 of the Federal Rules of Civil Procedure are met. There are or were thousands of geographically dispersed members of the Plaintiff Class, which renders joinder impracticable.

10.     There is a well-defined community of interest in the questions of law and fact uniformly affecting the members of the Plaintiff Class. The questions of law and fact common to the class members include, but are not limited to, the following:

a) Whether the WAP is a "top hat plan" as described in 29 U.S.C. §§1051(2), 1081(a)(3), and 1101(a)(1) and thus exempt from ERISA's reporting and disclosure, funding, accrual, vesting, anticutback, and fiduciary requirements;

b) Whether the Defendants breached their fiduciary duties and failed to comply with ERISA when they failed to create, fund, and maintain a separate trust for WAP participants as is required for pension plans that are not subject to the top hat exemption;

c) Whether the Defendants failed to comply with ERISA when they forfeited or attempted to forfeit Plaintiff Class members' accrued vested retirement benefits; and

d) The nature and extent of appropriate equitable relief to the members of the Plaintiff Class.

11.     Tolbert's claims are typical of the claims of the members of the Plaintiff Class and fairly encompass the claims of the members of the class. Tolbert and the members of the Plaintiff Class are similarly or identically harmed by the same systematic and pervasive pattern of Defendants' illegal conduct. As set forth more fully below, based upon the erroneous belief that the WAP is an exempt top hat plan, Defendants violated ERISA by failing to accrue, vest, fund, and pay retirement benefits as required by ERISA.

12.     All members of the Plaintiff Class are injured in their business or property by reason of Defendants' unlawful conduct. As WAP participants, all members of the Plaintiff Class have been denied, or are threatened with being denied, their legally protected rights under ERISA due to Defendants' ERISA violations.

13.     Tolbert and her counsel will fairly and adequately protect the interests of the class members. There are no material conflicts between the claims of Tolbert and the members of the Plaintiff Class that would make class certification inappropriate. Counsel for the class is experienced in this type of litigation and will vigorously assert the Plaintiff Class members' claims.

**B.      This Case Meets All Rule 23(b) Prerequisites.**

14.      Prosecution of the claims of the Plaintiff Class as a class action is appropriate under Rule 23(b)(1)(B), Rule 23(b)(2), and Rule 23(b)(3).

15.      The prosecution of separate actions by or against individual class members would risk (1) inconsistent or varying adjudications regarding individual class members that would establish incompatible standards of conduct for Defendants or (2) adjudications regarding individual class members of the class that would as a practical matter dispose of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

16.      Defendants have failed or refused to act on grounds generally applicable to the Plaintiff Class, thereby making appropriate final declaratory and equitable relief regarding the Plaintiff Class.  In particular, Defendants have not created a separate trust for the WAP, have not funded that trust, and have otherwise deprived Tolbert and the Plaintiff Class members of their statutory rights under ERISA.

17.      The questions of law or fact common to the Plaintiff Class members predominate over any questions affecting only the individual members.  Tolbert can and will demonstrate a viable method for proving common impact and damages to the Plaintiff Class members.

18.      A class action is both manageable and superior to other methods for the fair and efficient resolution of this controversy.

**IV.      DEFENDANTS CREATED THE WAP AND INVITED TOLBERT AND THOUSANDS OF OTHER EMPLOYEES TO PARTICIPATE IN AN EMPLOYEE RETIREMENT PENSION PLAN**

19.      The Royal Bank of Canada, together with its U.S. participating subsidiaries, including the corporate Defendants (collectively, "RBC"), established an Amended and Restated US Wealth Accumulation Plan (the "WAP"), dated November 1, 2008.  A true and correct copy

of that plan document is attached hereto as Exhibit "A" and incorporated herein in its entirety for all purposes. This version of the WAP is an updated version of numerous prior versions of the Plan which were continued by and under the WAP.

20.     Defendants are plan sponsors and fiduciaries regarding the WAP.

21.     Defendants are "Plan Obligors" as defined in the WAP. As such, they are the persons financially responsible for all relief to be granted in this case.

22.     Tolbert was a WAP "Participant," as that term is defined in the WAP, at the time of her leaving Defendants' employment.

23.     As of the date of her departure, and as a result of the WAP failing to meet the requirements of a top hat plan under ERISA, Tolbert was 100% vested in her retirement benefit, including employer contributions to her account. Nonetheless, Defendants illegally forfeited approximately $27,000 worth of employer contributions previously vested in her WAP retirement account.

24.     During the entirety of her nearly forty years of employment with Defendants, Tolbert was a secretary and administrative assistant. Tolbert (1) never served in a managerial capacity, (2) never had authority to hire or fire anybody, (3) never was in a position to negotiate a change to the WAP, and (4) never was highly compensated compared to the financial consultants or brokers in the office who made much more money than she ever did.

25.     All Plaintiff Class members were also WAP Participants.

26.     The WAP is an employee pension plan within the meaning of 29 U.S.C. § 1002(2)(A) because it is a plan, fund, or program that was established or maintained by an employer to provide retirement income to employees, or to provide for a deferral of income by employees for periods extending to the termination of a covered employment or beyond.

Defendants concede this point. *See* the September 23, 2008 e-mail to WAP Participants attached hereto as Exhibit B.

## V.    THE FUNDAMENTAL ISSUE

27.     Although Tolbert had been a loyal employee for nearly forty years and a WAP participant for six years, Defendants fired her and stripped her of all employer contributions previously credited for her benefit under the WAP. Her forfeited amount approaches $27,000.

28.     Defendants attempt to justify their conduct based on a clause in the WAP plan document which provides that:

> Notwithstanding anything to the contrary in this <u>SECTION 4</u>, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, *regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to the Company.* (emphasis added).

29.     Although Tolbert denies that she was properly fired for cause, whether she was properly fired for cause is irrelevant to her claims, is irrelevant to the Plaintiff Class's claims, and is a non-issue in this case.

30.     Instead, the heart of her claim is whether the WAP is an illegal ERISA pension plan. If so, the above forfeiture clause, which purports to authorize the forfeiture of her otherwise vested retirement benefits, violates ERISA and is thus illegal.

31.     The answer to that question turns on whether at all relevant times the WAP has been a valid top hat plan exempt from ERISA's vesting (and other important employee protection) requirements. If the answer is no, the forfeiture clause violates ERISA—and—the WAP is subject to the full cornucopia of Congressionally mandated employee protections, which apply to Tolbert and the entire Plaintiff Class.

32.     Those protections would benefit Tolbert and the entire Plaintiff Class in the same manner.  For example, Defendants would be required to remedy their illegal conduct by providing all WAP participants with the full range of ERISA protections, including the mandatory vesting, accrual, funding, anti-cutback, reporting, and other requirements.  These remedies would apply in the same manner for Tolbert and all Plaintiff Class members.

33.     Thus, the fundamental issue for Tolbert and the Plaintiff Class is whether at all relevant times the WAP has been a lawful top hat plan.  As discussed below, because Defendants rely on ERISA's top hat exception to justify their forfeitures of otherwise vested accrued benefits and other conduct that violates ERISA unless the top hat exception applies, their conduct is presumably illegal and they have the burden to prove otherwise.

34.     The ramifications of the answer to that foundational issue for Tolbert, the Plaintiff Class, and Defendants are enormous, because Defendants have never created or funded the required separate trust necessary to protect all participants' promised and Congressionally protected retirement benefits.

## VI.     CONGRESS'S PLAN TO PROTECT TOLBERT AND THE PLAINTIFF CLASS FROM DEFENDANTS' MISCONDUCT

### A.     ERISA Is A Remedial Statute Designed To Protect Employees, Not Employers.

35.     In determining a statute's meaning, courts look not only to the particular statutory language, but to the statute's design as a whole and to its object and policy.[1]  Thus, when addressing whether a plan is exempt from certain of ERISA's substantive laws, courts should consider first the policies underlying ERISA and the top-hat exception.[2]

---

[1] *E.g., Cranden v. U.S.*, 494 U.S. 154, 158, 110 S.Ct. 997, 1001 (1990).

[2] *See Nachman Corp. v. PBGC*, 446 U.S. 359, 361-62, 374-75, 100 S.Ct. 1723, 1726, 1732-33(1980)(analyzing statutory purpose when applying ERISA); *Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996)(same).

36.     "ERISA is a remedial statute designed to protect the interests of employees by guarding against abuse in the administration of such benefit plans...."[3]

37.     Specifically, ERISA exists because Congress found that:

> The continued well-being and security of millions of employees and their dependents are affected by [employee benefit] plans;
>
> * * *
>
> that owing to the lack of ... adequate safeguards regarding their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and free flow of commerce, that ... safeguards be provided with respect to the establishment, operation, and administration of such plans;
>
> * * *
>
> that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans;
>
> * * *
>
> that owing to the termination of plans, before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries. . .that minimum standards be provided assuring the equitable character of such plans and their financial soundness.[4]

38.     Additionally,

> One of Congress' central purposes in enacting [ERISA] was to prevent 'the great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated.
>
> * * *
>
> Congress wanted to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement  and if he has fulfilled whatever conditions are required to obtain a vested benefit he will actually receive it.[5]

---

[3] *Hollingshead v. Burford Equip. Co.*, 747 F. Supp. 1421, 1426 (M.D. Fla. 1990).

[4] 29 U.S.C. §1001.

[5] *Nachman*, 446 U.S. at 374-75 (footnotes omitted).

39. Also, Congress recognized that many people need legislative help in protecting their pension benefits because they lack sufficient economic bargaining power to obtain contractual rights to non-forfeitable benefits.[6]

40. To achieve its goals, Congress enacted expansive laws that are designed to protect the integrity of pension plans and their participants and beneficiaries' expectations.[7] For example, ERISA makes it illegal for employers to forfeit employees vested and accrued benefits.[8]

41. Additionally, ERISA imposes ***maximum vesting*** requirements with which *all* pension plans must comply.[9]

42. Similarly, ERISA imposes benefit accrual requirements for all covered pension plans.[10]

43. Plan provisions that violate these anti-forfeiture, vesting, and accrual laws are void and unenforceable.[11]

44. ERISA also requires plan assets to be held in trust by the employer.[12]

**B.    The Top Hat Exception Is Limited In Scope And Application.**

45. Congress recognized that a few senior executives who, due to their influential position and sophistication with respect to financial matters, can protect themselves and do not need ERISA's protections.

---

[6] *E.g., Gallione v. Flaherty,* 70 F.3d 724, 727 (2d Cir. 1995).

[7] *Gallione,* 70 F.3d at 727.

[8] 29 U.S.C. § 1053(a).

[9] 29 U.S.C. § 1053.

[10] 29 U.S.C. § 1054.

[11] *Bruchac v. Universal Cab Co.,* 580 F. Supp. 295 (N.D. Ohio 1984); *See also Alessi v. Raybestos - Manhattan, Inc.,* 451 U.S. 504 (1981).

[12] 29 U.S.C. § 1101 *et seq.*

46.     Therefore, Congress created a narrow exception to ERISA's substantive protections for those plans that include only high officials that do not need those protections.[13] This exception applies to top hat plans, which are defined as:

> [A] plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.[14]

47.     Top hat plans are excluded from certain ERISA requirements, including vesting, accrual, and funding requirements, because Congress considers "top-level" management, unlike most employees, capable of protecting their own pension expectations.[15]

48.     Thus, as the name suggests, top hat plans are limited to those people who:

> by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their compensation plan, considering any related risks, and therefore, do not need the substantive rights and protections of [ERISA].[16]

49.     Courts review the legal question of whether a plan qualifies as a top hat plan *de novo*.[17] As a result, this Court is properly and uniquely situated to adjudicate the legality of Defendants' claimed top hat exemption.

---

[13] *E.g., Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 288 (3d Cir. 1995), *cert. denied*, 116 S. Ct. 1826 (1996); *In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996), *cert. denied*, 117 S. Ct. 947 (1997); *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1015 (S.D.N.Y. 1995).

[14] 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

[15] *Gallione*, 70 F.3d at 727, 728; *Bigda*, 898 F. Supp. at 1015.

[16] *Duggan*, 99 F.3d at 312-311 (*quoting* U.S. Department of Labor ERISA Opinion 90-14A at 2); *Hollingshead*, 747 F. Supp. at 1429-30 (same); *Bigda*, 898 F. Supp. at 1015; *Carr v. First Nat'l Bank*, 816 F. Supp. 1476, 1491 (N.D. Cal. 1993).

[17] *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir. 2001) ("Given the unique nature of top hat plans, we believe the holding of *Firestone Tire* requiring deferential review for the discretionary decisions of administrators to be inapplicable"); *Rumpke v. Rumpke Container Serv.*, 240 F. Supp. 2d 768, 771-72 (S.D. Ohio 2002) ("Courts give no discretion to administrators for legal determinations").

## C. Courts Construe ERISA Liberally To Achieve Congressional Goals And Intent.

50. Remedial statutes are to be construed liberally to affect their purpose.[18] Thus, courts uniformly hold that ERISA is to be liberally construed.[19]

51. Correspondingly, courts should construe narrowly exceptions to ERISA's broad protections.[20]

52. Moreover, courts have greater remedial discretion when Congress authorizes equitable relief.[21]

53. Therefore, this Court should construe ERISA broadly and the top hat exemption narrowly to achieve Congress' stated goals.

## D. The Top Hat Exception Applies Narrowly.

54. The top hat exception applies to only those plans that do not include employees who need ERISA'S protections:

> It is also the Department's position that the term 'primarily', as used in the phrase 'primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees' ... refers to the purpose of the plan (*i.e.*, the benefits provided) and not the participant composition of the plan. Therefore, a plan which extends coverage beyond a select

---

[18] *See Kruss v. Western Elec. Co.*, 701 F.2d 138, 1242 (7th Cir. 1983) ("ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants..."); *International Nutrition, Inc. v. U.S. Dept. of Health and Human Serv.*, 676 F.2d 338, 341 (8th Cir. 1982).

[19] *See Deibler v. United Food and Comm. Workers Local Union 23,* 1973 F.2d 206, 209 n. 5 (3d Cir. 1992) ("As we explore this issue, we will keep in mind the intent of Congress 'that coverage under [ERISA] be construed liberally to provide the maximum degree of protection to working men and women covered by private retirement programs'"); *Starr*, 757 F. Supp. at 393; *Gilliam v. Edwards*, 492 F. Supp. 1255, 1261 (D.N.J. 1980).

[20] *See* 29 U.S.C. §§ 1003(a), 1003(b); S. Rep. No. 93-127 at 18, *reprinted in* 1974 U.S.C.C.A.N. 4639, 4854 ("[E]xemptions to ERISA should be confined to their narrow purpose"); *Olsen v. Lake County, Inc.*, 955 F.2d 203, 206 (4th Cir. 1992) (exemptions from remedial statutes are to be narrowly construed); *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 105 (3d Cir. 1990) (same); *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 933 (7th Cir. 1989) ("ERISA is clearly a statute of general application, one that envisions inclusion within its gambit as the norm. The exceptions from coverage are explicit and specifically defined, as well as few in number").

[21] *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 170 (8th Cir. 1995).

group of management or highly compensated employees would not constitute a 'top-hat' plan.....[22]

55.     Because the statutory elements make the top hat category a narrow one,[23] top hat plans form a "rare sub-species of ERISA plans."[24]

**(1).     The Select Group Requirement.**

56.     Not only must the plan be unfunded and exhibit the required purpose, it must also cover a only "select group" of management or highly compensated employees.[25] Top hat plans thus "cover narrow groups of select individuals" that are limited in number who are placed highly in the organizational hierarchy.[26]

57.     The "select group" limitation has both quantitative and qualitative restrictions.[27] In number, the plan must cover relatively few employees.[28] There is no bright-line test for determining at what point a group of participants becomes too large to qualify as a "select group." The "term 'select group' seems to imply a small percentage of the total number."[29]

---

[22] *Hollingshead*, 747 F. Supp. at 1430 (*quoting* U.S. Department of Labor ERISA Opinion 90-14A at 2); *Carrabba*, 38 F. Supp. 2d at 477-78. (This is the liability phase decision, which the Fifth Circuit affirmed after the district court entered its final judgment for the plaintiff class following the damages phase. The Supreme Court denied both side's petitions for writs of certiorari.)

[23] *New Valley*, 89 F.3d at 148, and 153.

[24] *Id.*

[25] *Id.*

[26] *Id. at* 153.

[27] *Id.*; *Duggan*, 99 F.3d at 312-313; *Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (reversing summary judgment for *employer*/defendant and finding that plan was not a top hat).

[28] *New Valley*, 89 F.3d at 148. Moreover, the exception includes only a select group of "management or highly compensated employees;" therefore, the group of potential candidates is limited to "management or highly compensated employees" from which the select group is drawn. 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

[29] *Darden v. Nationwide Mut. Ins. Co.*, 796 F.2d 701, 708 (4th Cir. 1986) (no top hat exemption because approximately 20% of workforce covered by agreement); *see Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 288 (2d Cir. 2000) (highest percentage of employees covered by a plan found to have been a top hat plan is 15%). On the high end, one court has found that a plan offered to as many as 15.34% of employees was nonetheless sufficiently selective to qualify as a top hat plan. *Id.* at 288-89. In contrast, a plan offered to an only slightly larger percentage, 18.7% of the workforce, was found too large to meet the selectivity requirement. *Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989), *aff'd*, 922 F.2d 203 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992).

Moreover, the "select group" requirement includes more than a mere statistical analysis.[30] In character, the plan must cover "only high level employees."[31]

58.     Here, the actual participant data shows that the WAP population cannot satisfy the select group requirement.

59.     Additionally, and without limitation, Defendants cannot meet the select group requirement because Tolbert (and numerous other WAP participants) had no ability to directly negotiate individual rights or protections under the WAP.[32] It was a take it or leave it deal.

**(2).     The Management Requirement.**

60.     ERISA does not define "management." Therefore, the term, should be construed narrowly to achieve ERISA's remedial purposes. Moreover, just as statistics alone do not determine whether a group is select, the title "manager" should not alone decide whether a person is the required "upper echelon," "top-level," or "high ranking" management with sufficient influence to negotiate his or her own protection.[33] For example, it is not uncommon for an employer today to reward an employee for years of long service with the title of manager. That does not, however, mean that such person is in fact a part of "management" and certainly does not mean that person is a member of executive management within the contemplation of Congress and the top hat exception.

---

[30] *Duggan*, 99 F.3d at 312-313. In addressing the select group issue, earlier cases looked statistically at the member participants in relation to the total number of employed. Because this statistical approach does not address whether the Plan includes people who need ERISA's help, more recent cases go beyond the numbers and look to see qualitatively whether the plan includes people who need ERISA's protection. *See New Valley*, 89 F.3d at 148; *Virta*, 1996 WL 663970, *2.

[31] *Id.*; *Bigda*, 898 F. Supp. at 1015 (covers "high-ranking employees").

[32] *See Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp.2d 468, 478 (N.D. Tex. 1999).

[33] *New Valley*, 89 F.3d at 148 ("only high level employees"); *Gallione*, 70 F.3d at 727 ("Top level management," "upper echelon management"); *Bigda*, 898 F. Supp at 1015 ("high ranking employees").

### (3). The Highly Compensated Requirement.

61. Similarly, Congress did not define "highly compensated," which is a relative term that can mean different things to different people depending on where they are in the corporate hierarchy. Thus, the "highly compensated" element begs the question: highly compensated compared to whom? Moreover, statistics can be deceiving as low level employees can look highly compensated compared to an average. But that does not mean that the employees at issue are so highly compensated, when compared to the senior executive decision makers, that they have sufficient economic bargaining power and sophistication to in fact individually influence the design and operation of the WAP.[34]

62. For example, in *Simpson v. Ernst & Young*, the court held that a $190,000 per year partner in a national accounting firm was not highly compensated when compared with the $600,000 per year partners who formed and ran the firm's retirement plan.[35]

63. Similarly, in ERISA Opinion 85-37A, the Department of Labor compared the salary range and average salary of the six company officers and directors who were plan participants, to the salary range and average salary of the remaining 33 participants. The officers and directors had annual salaries ranging from $26,245 to $55,000 with an average of $37,917. In contrast, the remaining 33 participants had salaries ranging from $12,121 to $29,100, with one at $37,917. The average salary of these 33 participants was $18,584. Based upon the broad range of salaries and positions of the employees covered by the plan, the Department of Labor concluded that the plan did not qualify as a top hat plan.

---

[34] *See Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp.2d 468, 478 (N.D. Tex. 1999).

[35] *Simpson v. Ernst & Young*, 879 F. Supp. 802, 816 (S.D. Ohio 1994), *aff'd*, 100 F.3d 436, 441-442 (6th Cir. 1996), *cert. denied*, 117 S.Ct. 1862 (1997).

64.    Thus, the Court should look qualitatively to see if the Plan included non-senior management who were also not so highly compensated at RBC that they could affect or substantially influence the Plan's design and operation, considering any related risks.

**E.    Defendants Must Prove That They Maintained The WAP As A Lawful Top Hat Plan.**

65.    An employee benefit plan is covered by ERISA until proven otherwise, as ERISA broadly applies by default to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce . . . ."[36]

66.    The statutory language speaks for itself: all of ERISA applies to all retirement plans unless the plan falls within an exception to ERISA coverage.[37]    ERISA's substantive protections thus apply and Defendants' conduct and various ERISA protections apply, unless Defendants prove that the WAP was at all times exempt from those statutory protections.[38]

---

[36] 29 U.S.C. § 1003 (a).  Specifically, ERISA defines the term "employee pension benefit plan" as:

> Any plan, fund, or program . . . established or maintained by an employer. . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund or program -
>
> (i) provides retirement income to employees, or
>
> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

[37] 29 U.S.C. § 1003(a).  See  Hollingshead v. Burford Equip. Co., 747 F. Supp. 1421, 1427-28 (M.D. Ala. 1990) (discussing what constitutes an ERISA plan).

[38] Starr v. JCI Data Processing, Inc., 757 F. Supp. 390, 394 (D. N.J. 1991); Virta v. DeSantis Enters., Inc., 1996 WL 66 3970, *2 (N.D.N.Y. 1996) (defendant's burden of proof on affirmative defense of top hat exemption); see also Barrowclough, 752 F.2d at 932 (burden of proof to show compliance with safe harbor regulation was on employer); see also SEC v. Ralston Purina Co., 346 U.S. 119, 126, 73 S.Ct. 981, 985 (1953) (issuer seeking protections of the safe harbor for private offerings bears the burden of proving that the offering was private, because of the "broadly remedial purpose of federal securities legislation"); Mark v. FSC Sec. Corp., 870 F.2d 331, 333 (6th Cir. 1989) (same); Swenson v. Engelstad, 626 F.2d 421, 427 (5th Cir. 1980)(same).

**F.**     **Defendants Blew The Top Hat Exemption And Violated ERISA.**

67.     Defendants failed to maintain a valid top hat plan, violated ERISA, and are liable to Tolbert and the Plaintiff Class because they cannot show that they maintained the WAP for a select group of management or highly compensated employees. Rather, Defendants maintained the WAP as a large, pre-packaged retirement plan in which thousands of different employees, covering an extraordinarily broad range of jobs and compensation, participated.

68.     Sworn testimony from a Defendant's Defined Contribution Plan Manager shows that Defendants viewed determining WAP eligibility as being "problematic" in part from the fact that even as late as September 28, 2010 Defendants still did not realize the Department of Labor had in Op. 90-14A twenty years earlier established its qualitative test for determining who qualifies as a top hat person. Thus, for at least twenty years, Defendants were shooting in the dark when attempting to establish a lawful basis for WAP participation.

69.     Accordingly, there was no effort to impose *any* standard by which an employee's individual ability to effectively negotiate his or her own benefit protections was assessed and determined by his or her ability to participate in the WAP.

70.     Worse yet, although they could have done so, Defendants did not specifically define "management" or "highly compensated" for WAP purposes.

71.     Additionally, Defendants' own words prove summarily that the WAP was/is not a valid top hat plan. The accompanying September 23, 2008 e-mail shows, among other things, that the WAP covered an overwhelming number of employees with no management responsibilities and/or relatively low compensation. *See,* Ex. "B". Neither the persons eligible to participate in the WAP, nor the group of actual WAP participants was in fact a select group of management or highly compensated employees under ERISA or DOL Op. 90-14A.

### (1). Defendants' dramatically increased eligibility thresholds show the WAP's over inclusive population.

72.     WAP eligibility was always based solely on an employee's business production or compensation level. As of 2002, according to certain Defendant documents the eligibility thresholds were:

- Financial Consultants - $300,000 fiscal year gross production

- Branch Directors - $300,000 fiscal year gross production or minimum compensation of $150,000

- For all others, fiscal year compensation of $150,000

73.     However, according to a Defendants' Defined Contribution Plan Manager, a Financial Consultant with $300,000 gross production would receive only $117,000 in compensation (perhaps more depending upon the terms of the Financial Consultant's "Compensation Plan.")

74.     According to certain Defendant documents, those eligibility thresholds remained in place until 2009 when Defendants essentially doubled the eligibility thresholds as follows:

- Fiscal year production for Financial Consultants and Branch Directors from $300,000 to $400,000 beginning January 2010

- For all others, they increased the minimum compensation from $150,000 to $350,000

The latter point represents, in Defendant's view, a 133% overnight increase in what ostensibly constituted "highly compensated" just the day before.

75.     If in 2010 $350,000 one day became the minimum compensation for which one could qualify as a "top hat person," then a minimum compensation 43% smaller than that amount the day before means there were substantial numbers of non-top hat persons participating in the WAP long before that change. Although Defendants' recognition that the WAP was (grossly)

too expensive to be a lawful top hat plan, purging the population to a much smaller group (itself not a top hat group) cannot rectify Defendants' prior illegal conduct.

**(2).   Plan participation was voluminous.**

76.   Defendants introduced and maintained the WAP as an important tool to entice and retain quality employees:

> The WAP is an important part of the Total Rewards package offered at RBC Wealth Management and is integral to our Finishing Well strategy. (November 19, 2008 e-mail to RBCWM-Complex Directors)

77.   That is, Defendants offered the WAP as a huge carrot. Their plan worked.

78.   In March 2001, Defendants had approximately 1,200 employees participating in the WAP—hardly a "select group" by any standards. (March 13, 2001 letter by Bruce Sabin, Vice President, Benefits Manager).

79.   By January 2008, the number of eligible participants had swollen to 2,675 employees out of a broadly defined general population of 15,095 (an employee population "based on any employee who worked in 2007 regardless of employment status) or approximately 18% of that broadly defined employee base.

80.   It stretches credibility for Defendants to suggest that all of those 2,675 persons had the personal ability to negotiate individual terms of the WAP that would protect his or her individual interests.

81.   Indeed, Tolbert and other participants were never told that the WAP's terms were negotiable. Nor were they ever offered to participate in the WAP on any basis other than a take it or leave it basis.

**(3).    Defendants booted over a thousand participants from the WAP.**

82.    The WAP population bloat grew to such proportions that in 2008 Defendants decided to drastically reduce the number of participants.

83.    Defendants imposed new eligibility requirements that dramatically shrank the number of eligible employees.  Defendants projected that the new eligibility requirements would reduce the number of eligible employees from almost 18% of the work force to 10.93% of the work force.

84.    Specifically, Defendants projected that the changes would render 1,265 previously eligible employees ineligible:

- Financial Consultants – 325 employees (1,248 drops to 923)
- Branch Directors – 30 employees (124 eligible drops to 94)
- All Others – 910 employees (1,474 eligible drops to 564)

85.    Not only did the number of future WAP eligible employees plummet, but the eligibility changes in fact dramatically culled the number of existing actual participants.

86.    Defendants projected that the eligibility requirement changes would reduce the number of actual participants by 444 persons, or 35%:

- Financial Consultants: 273
- Branch Directors: 28
- Capital markets including GTO and Functions: 55
- Primary Advisor Services: 24
- Wealth Management including GTO and Functions: 20
- RBC Liberty: 13
- Voyager: 10

- PCG (non-FCS or BDS): 8
- Global Private Banking: 8
- RBC Banking: 5

87.    Again, the magnitude of these reductions shows that for years the WAP included numerous non-top hat participants.

**(4).    At least half the WAP participants were not management of any kind.**

88.    Tolbert's nearly forty year career was essentially as a secretary or administrative assistant to RBC brokers.  At no time did any employees report to her, nor did she manage any part of Defendants' business.

89.    After decades of devoted service, awards, and good reviews, Tolbert asked for a raise.  Instead of giving her a raise, she received the title of "associate vice president."  Despite her title, her job did not change, she was not given any management responsibility, and she was not really the vice president of anything.  Her prior responsibilities—being an administrative assistant for her boss—remained the same.  By any stretch of the imagination, Tolbert cannot be considered to have been a management person, let alone a top level manager capable of negotiating individualized protections in the one size fits all WAP.

90.    Tolbert was one of numerous non-top management persons in the WAP.

91.    The WAP pool includes at least the following broad range of jobs:

    a.    Administrative Manager

    b.    Applications Services Director

    c.    Associate Counsel

    d.    Branch Manager

    e.    Chief Information Officer

f.      Chief Investment Officer-Equities

g.      Chief Operating Officer

h.      Co-Branch Manager

i.      Commodities Manager

j.      Compensation, Benefits & HRMS Director

k.      Complex Director (Phoenix)

l.      Complex Director (Washington DC)

m.      Community Affairs & Diversity Director

n.      Consultant Relations

o.      Correspondent Services President (RBC Dain Rauscher)

p.      Deputy General Counsel

q.      Deputy General Counsel-Compliance Director-FICM

r.      DCSD National Director-Business Development

s.      Institutional Trader

t.      Finance, Administration & Operations Director

u.      FICM Research & Strategies Director

v.      Fixed Income Banking Sectors Director

w.      Financial Consultant

x.      Financial Consultant Assistant Branch Manager

y.      Fixed Income Research Analytics Manger

z.      Fixed Income Portfolio Strategies Manager

aa.      Fixed Income Credit Research Director

bb.      Fixed Income Senior Portfolio Manager

cc. Fixed Income Trading Manager

dd. Institutional Retirement Representative

ee. Institutional Sales & Marketing Representative

ff. Institutional Trader

gg. Investment Banker

hh. Manager-Investment Banker

ii. Managing Director

jj. Municipal Underwriting Associate

kk. Mutual Funds Director (RBC)

ll. PCG Research Analyst

mm. Portfolio Manager-Senior Analyst-Equity

nn. President, Advisory Services

oo. Operations Manager

pp. Private Client Research Group Analyst

qq. Regional Business Retirement Plan Consultant

rr. Retail Trader

ss. Salesperson

tt. Senior Corporate Bond Analyst

uu. Senior Human Resources Generalist

vv. Senior Fixed Income Portfolio Strategist

ww. Senior Institutional Trader

xx. Senior Institutional Underwriter-Trader

yy. Senior Investment Associate

zz.  Senior Municipal Bond Analyst

aaa.  Senior Portfolio Manger-Director, Equity Research

bbb.  Senior Retail Trader

ccc.  Senior Underwriter

ddd.  Telecommunications Services Director

eee.  Trader

fff.  Wealth Management Consultant

ggg.  Wide Area Network Manager

92.  According to Defendants, "top executives" would include titles such as regional director, managing director, and complex directors.

93.  As of at least January 2008, there were 1,248 Financial Consultants who were eligible to participate in the WAP. Those 1,248 WAP eligible Financial Consultants represented 46.7% of all eligible employees.

94.  In 2003, the Financial Consultants comprised 56.37% of the WAP participants (757 Financial Consultants/586 other participants). In 2009, Financial Consultants still comprised the majority of WAP participants at 54.66% (1,308 Financial Consultants/1,085 other participants).

95.  In September 28, 2010, Defendants' Defined Contribution Plan Manager, unequivocally testified Financial Consultants are not part of management.

96.  While a definitive count cannot be made until there has been substantial discovery, the above information strongly suggests that well over half of the WAP participants could not be classified as management at all, let alone being "high level" or "senior management" who did not need ERISA's protections to protect their WAP retirement benefits.

**(5). The WAP contained many actual participants who cannot be considered highly compensated.**

97.     In 2001, Tolbert began receiving information regarding the WAP. In December 2001, she received a plan summary stating she could make deferrals when her compensation reached $150,000.

98.     Although Tolbert's actual job responsibilities were that of an administrative assistant, due to her long tenure her total compensation finally reached $150,000 in 2003 and she began contributing to the WAP beginning with her October 15, 2003 paycheck. Nonetheless, she could hardly be considered as highly compensated when compared to other employees of Defendants. For example, from 2003 until his departure in August 2009, Tolbert estimates that her boss's compensation ranged from between $500,000 to as much as $1,000,000 per year, and he was not management.

99.     Additionally, information available to Tolbert suggests that numerous non-management employees with compensation less than the so-called $150,000 minimum threshold participated in the WAP; however, discovery is needed to verify and quantify that information.

100.     Moreover, although the documents are not clear, Defendants' documents indicate that there were and are numerous WAP Participants with total individual compensation well in excess of $1,000,000 ranging to over $7,000,000 per year.

101.     Furthermore, publicly available reports show that truly top hat executives at RBC in 2010 received total direct compensation ranging from $3,800,000 to $11,000,000 Canadian and as high as $10,200,000 US. (2011 proxy statement). Reuters reports comparable senior executive compensation levels. Based on a $350,000 minimum compensation threshold (and assuming that Defendants actually enforced that threshold), Defendants' senior executives receive compensation more than 28 times larger than the threshold amount. The compensation

disparity between the truly top-hat personnel and the rank and file, low level WAP participants is staggering. That difference also disproves any notion that the WAP is a valid top-hat plan.

102. Finally, the data appears to reflect that there were numerous WAP Participants whose total compensation was well below the average compensation for all employees. For example, the compensation of participants in 2003 who were Financial Consultants was as low as $72,132 (whereas the average annual compensation of the *entire* workforce was $75,132) and ranged from that figure up to $1,860,255 – a 2,482% difference amongst just Financial Consultants.

## G. Tolbert's (And The Plaintiff Class') Injuries Are Caused By Defendants And Not By The Plan Itself.

103. Tolbert's injuries, and those of the Plaintiff Class members, arise because the Defendants failed to maintain the WAP as a legal and valid top hat plan and not from any discretionary approval or denial of specific, individual benefit claims. That is, the conduct complained of—forfeiture of otherwise vested accrued employer contributions to Tolbert's retirement account—would have been lawful had Defendants properly maintained the WAP as a valid top hat plan. But, they failed to do so.

104. Defendants' forfeiture of otherwise vested accrued retirement plan benefits for Tolbert and other Plaintiff Class members thus violates ERISA regardless of the plan's terms.

105. Likewise, Defendants' failure to establish, fund, and maintain a separate trust fund to protect WAP participants' retirement benefits for Tolbert and the Plaintiff Class violates ERISA regardless of the plan's terms.

106. In sum, Defendants' conduct, outside of the plan terms, constitutes a clear and continuing violation of Tolbert's and Plaintiff Class's non-discretionary statutory ERISA rights

that will not be abated or corrected without this Court's equitable intervention requiring Defendants to comply with Congressionally mandated employee protections.

107.     Defendants have no discretion to maintain an illegal ERISA protected retirement plan. Thus, this Court's review of Defendants' conduct turns on whether the WAP was at all times a valid top hat plan, which requires this Court's *de novo* review of the matter.

**H.     The WAP Is An Unfunded Plan, Has No Assets, And Is Wholly Incapable Of Providing Tolbert Or The Class Members With Any Relief.**

108.     One of the elements of a true top hat plan is that it is an unfunded plan such that its participants are merely unsecured creditors of the plan sponsors.

109.     Because Defendants purported (albeit unsuccessfully) to maintain the WAP as a top hat plan exempt from ERISA's critical employee protections, they consciously and conscientiously failed to fund the plan with any assets at all. Indeed, the WAP plan document states that the participants are merely unsecured creditors of the defendants. And, it is undisputed that Defendants failed to fund a trust with any assets, let alone with sufficient assets to rectify the injuries and losses Defendants inflicted on Tolbert and the class members by Defendants ERISA violations.

110.     Consequently, it would be futile and a waste of time and resources for Tolbert (and the class members) to pursue any remedies against the plan itself.

**I.     This Is Not A Typical ERISA Benefits Case.**

111.     In the typical benefits claim, the participant for example may seek to recover total disability benefits. The administrative committee may investigate the claim and decide that factually the participant is only partially disabled or not disabled at all. In theory, the administrative committee will have putative expertise in resolving coverage or liability issues related to the claim. Likewise the administrative appeals group is presumed to have some

expertise and qualifications in the area. Thus, by the time the denied claim gets to the district court, the court's normal function is to provide an administrative review for an abuse of discretion by the administrative bodies based on the closed record much like a district court reviews an administrative agency's decisions for an abuse of discretion.

112.     That process, however, does not apply in this case. Here, Tolbert and the Plaintiff Class are not asserting a 29 U.S.C. § 1132(a)(1) claim for benefits due under the WAP's terms. Indeed, under the WAP's terms as written, Tolbert does not have benefits due under the WAP because the plan document provides (illegally) that Defendants could forfeit her employer contributions if they fired her for cause. As stated above, whether she was properly fired for cause (which she denies) is not even at issue in the case. Rather, the fundamental issue is whether the WAP is a lawful top hat plan. Also as stated above, that is a *de novo* decision for this Court without regard to Defendant's view of that subject.

**J.     Defendants Have Made Their View Of The Top Hat Issue Clear.**

113.     On at least two prior occasions WAP participants have alleged the WAP is an illegal top hat plan. In both instances, Defendants without pause adamantly and tersely pronounced that the WAP is a valid top hat plan and that is that. In both instances, the matters were resolved without a court decision.

114.     But the issue will not simply go away as Defendants would like. Rather, whether the WAP is a legal top hat plan is an important issue that will not simply disappear. The issue is pervasive, affects the rights of over a thousand people spread around the country and needs to be resolved once and for all. Now is the time and this is the case in which to resolve that issue once and for all.[39]

---

[39] For the record: (1) Defendants fired Tolbert on August 6, 2009; (2) Tolbert on January 18, 2010 requested in writing a distribution of her vested WAP benefits in installments as she had previously designated; (3) Defendants

## VII.   First Claim

### Claim For Declaratory Judgment That The WAP Is Not A Top Hat Plan

115.   Based on the foregoing facts, Tolbert and the Plaintiff Class seek a declaratory judgment that at all relevant times the WAP has not been a lawful top hat plan.

## VIII.   Second Claim

### Claim For Equitable Relief Because
### The WAP Is Not A Lawful Top Hat Plan

116.   Based on the foregoing facts, because the WAP was not a lawful top hat plan, it was subject to all of ERISA's requirements, including without limitation its funding, vesting, accrual, and reporting requirements.

117.   Accordingly, pursuant to 29 U.S.C. § 1132(a)(3), Tolbert, for herself and on

---

ignored her request for months despite her interim calls asking when she would receive her benefits; and (4) on June 14, 2010—six months later—Defendants finally responded by telling her that all of her employer contributions and related earnings thereon had been forfeited because she (allegedly) had been fired for cause. In fact, her firing was an integral part of Defendants' ongoing plan to force her boss of approximately thirty years to retire and to relinquish his very successful book of business to younger brokers.

Tolbert and her boss were an inseparable team. He brought in the business and she handled the mechanics of getting the business done. Although her boss was very active and successful, Defendants determined that it was time to put him out to pasture and that he needed to turn his customers over to younger brokers. Her boss, however, disagreed with Defendants' plan. Thus, Defendants began a scheme to irritate Tolbert and her boss by changing the way they did their business in ways that made their long-time approved practices no longer acceptable. Over time, Defendants' efforts caused substantial friction between Defendants on one hand and Tolbert and her boss on the other hand.

Ultimately, Defendants placed Tolbert's boss, but not Tolbert, under a "heightened supervisory memorandum." In early August 2009, at the end of a day, Tolbert made a technical error (of a non-regulatory and a non-monetary nature) that violated her boss's technical supervisory memo. The next morning, Tolbert saw her mistake and immediately notified the appropriate persons and corrected the error before the market opened for business. There was no impact to the customer or to Defendants. Nonetheless, Defendants seized the opportunity to immediately fire Tolbert based on the apparent belief that firing her would cause her boss to retire as Defendants had been urging him to do for an extended time period.

Defendants' plan worked, in part, but did not produce the results that Defendants desired. Tolbert's boss left, became employed by a competitor, Tolbert joined him there, and within weeks virtually his entire book left Defendants and followed Tolbert and her boss to their new employer where they continue to serve his customers to this day.

Defendants' decision to forfeit $27,000 of vested pension benefits for a nearly forty year employee under these circumstances can only be characterized as punitive.

behalf of the Plaintiff Class, seeks appropriate equitable relief requiring Defendants to, among other things, establish, fund, and maintain a separate trust to hold and protect all vested accrued WAP benefits, to restore any illegally forfeited benefits, to provide WAP participants with the required reporting information, to pay all appropriate penalties for not complying with ERISA, and for such other relief as the Court finds proper to fully protect Tolbert's and the Plaintiff Class's rights.

118.    Defendants are jointly and severally liable to Tolbert and the Plaintiff Class for all relief sought herein.

119.    Tolbert, individually and on behalf of the members of the Plaintiff Class also requests that the Court issue a permanent injunction prohibiting Defendants from further violating ERISA's funding, vesting, accrual, reporting, and other requirements in connection with the WAP.

## IX.    THIRD CLAIM

### Breach Of Fiduciary Duty

120.    Based on the foregoing facts, Defendants are responsible for their fiduciary breaches for which Tolbert and the Plaintiff Class seek redress. Tolbert and the Plaintiff Class sue for breach of fiduciary duties against Defendants pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2). Specifically, Defendants have breached their fiduciary duties and failed to act in good faith in that they jointly have the authority to control and manage the operation and administration of the WAP, and in such capacity, Defendants have failed to (i) cause the WAP to create, fund, and maintain a trust fund for the WAP participants' benefit, and (ii) discharge their duties with respect to the WAP solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to the participants and their beneficiaries.

## X.     FOURTH CLAIM

### Claim For Attorneys' Fees

121.     Tolbert, individually and on behalf of the Plaintiff Class, has retained the services of the undersigned attorneys to prosecute and bring this action to recover and enforce their rights under ERISA and to obtain redress for Defendants' fiduciary breaches. Therefore, Tolbert and the Plaintiff Class seek the recovery of all of their attorneys' fees and costs, as permitted by law (29 U.S.C. § 1132(g)) or equity.

### PRAYER FOR RELIEF

WHEREFORE, Tolbert and the Plaintiff Class pray that Defendants be cited to appear and answer herein, and that upon final trial of this cause, Tolbert and the Plaintiff Class be awarded judgment for the following:

a.     A declaration of the present and future rights of the Tolbert and the Plaintiff Class under the WAP;

b.     The above described equitable relief and appropriate penalties;

c.     Attorneys' fees and costs;

d.     Pre-judgment and post-judgment interest to the extent allowed by law; and

e.     Such other and further relief, either at law or in equity, general or special, to which Tolbert and Plaintiff Class may show themselves justly entitled.

Respectfully submitted,

*/s/ William G. Whitehill*
    William G. Whitehill
    State Bar No. 21356550
    Joe B. Harrison
    State Bar No. 09115500
GARDERE WYNNE SEWELL LLP
1601 Elm Street, Suite 3000
Dallas, Texas 75201
Telephone: 214.999.4633
Facsimile: 214.999.3633

ATTORNEY-IN-CHARGE FOR
PLAINTIFF, BRENDA TOLBERT

OF COUNSEL:

Geoffrey H. Bracken
State Bar No. 02809750
J. Palmer Hutcheson
State Bar No. 10335500
GARDERE WYNNE SEWELL LLP
1000 Louisiana, Suite 3400
Houston, Texas 77002-5007
Telephone: 713.276.5739
Facsimile: 713.276.6739

Certificate Of Service

I certify that a true and correct copy of the above First Amended Complaint was served on Defendants' counsel via the Court's electronic filing system and by first class mail this 7th day of April, 2011.

Alison J. Gates
Morgan, Lewis & Bockius LLP
1000 Louisiana, Suite 4200
Houston, Texas 77002
713-890-5157 (telephone)
713-890-5001 (facsimile)

Sari M. Alamuddin
Chris Boran
Morgan, Lewis & Bockius LLP
77 West Wacker Drive, Fifth Floor
Chicago, Illinois 60601
312-324-1000 (telephone)
312-324-1001 (facsimile)

ATTORNEYS FOR DEFENDANTS

*/s/ William G. Whitehill*
William G. Whitehill

# Amended and Restated

### Royal Bank of Canada

### US Wealth Accumulation Plan

And Prospectus

## The date of this document is NOVEMBER 1, 2008

This document constitutes part of
a prospectus covering securities
that have been registered under
The Securities Act of 1933

RBC Financial Group

60673594_5

EXHIBIT

A

TABLE OF CONTENTS

Page

SECTION 1 INTRODUCTION ........................................................................................................1
   1.1  General Nature and Purpose of the Plan ..............................................................................1
   1.2  Definitions...........................................................................................................................1
   1.3  Rules of Interpretation ........................................................................................................5

SECTION 2 DEFERRALS AND DEEMED INVESTMENTS..........................................................5
   2.1  Eligibility............................................................................................................................5
   2.2  Election to Voluntarily Defer Compensation .....................................................................5
   2.3  Mandatory Deferral of Compensation ...............................................................................6
   2.4  Election of Investments.......................................................................................................6
   2.5  Intra-Plan Transfers ...........................................................................................................6
   2.6  Company Contributions.......................................................................................................6

SECTION 3 INFORMATION CONCERNING INVESTMENT ALTERNATIVES ...................7
   3.1  Company Common Shares. ..................................................................................................7
   3.2  Plan Interest Rate................................................................................................................8
   3.3  Mutual Funds. .....................................................................................................................8
   3.4  Valuation.............................................................................................................................9

SECTION 4 VESTING....................................................................................................................9
   4.1  Vesting of Voluntary Deferred Compensation ...................................................................9
   4.2  Vesting of Mandatory Deferred Compensation and Company Contributions.....................9
   4.3  Termination For Cause .......................................................................................................9
   4.4  Terminations due to Restructuring.....................................................................................10
   4.5  Change in Control. .............................................................................................................10
   4.6  Forfeitures..........................................................................................................................10

SECTION 5 DISTRIBUTIONS .....................................................................................................10
   5.1  Distributions......................................................................................................................10
   5.2  Distribution Dates for Special Participants........................................................................10
   5.3  Distribution Dates for Other Participants. .........................................................................11
   5.4  Change In Control. .............................................................................................................12
   5.5  Form of Distributions.........................................................................................................12
   5.6  Distributions to Beneficiaries ............................................................................................13
   5.7  Designation of Beneficiary ................................................................................................13
   5.8  Disclaimers by Beneficiaries .............................................................................................14
   5.9  Federal Income Tax ...........................................................................................................14
   5.10  Tax Withholding...............................................................................................................15
   5.11  ERISA Matters..................................................................................................................15

SECTION 6 SPENDTHRIFT PROVISIONS .................................................................................16

## TABLE OF CONTENTS
### (continued)

Page

SECTION 7 ADMINISTRATION ................................................................................................16
7.1   The Committee..................................................................................................................16
7.2   Claims Procedure .............................................................................................................16
7.3   Making a Claim.................................................................................................................16
7.4   Requesting Review of a Denied Claim ............................................................................16
7.5   In General..........................................................................................................................17

SECTION 8 OTHER ADMINISTRATIVE MATTERS ............................................................17
8.1   Reporting...........................................................................................................................17
8.2   Plan Obligor; Status as Unsecured General Creditors. ....................................................17
8.3   Disclaimer of Employment and Bonus Rights.................................................................18
8.4   Administrative Expenses of the Plan ...............................................................................18
8.5   No Compensation Under the Qualified Plan ...................................................................18
8.6   Voting Rights.....................................................................................................................18
8.7   Governing Law ..................................................................................................................18

SECTION 9 AMENDMENT OR TERMINATION ...................................................................19
9.1   Amendments to and Termination of Plan ........................................................................19
9.2   Merger...............................................................................................................................19
9.3   Applicability to Successors..............................................................................................19

60673594_5

## SECTION 1
## INTRODUCTION

1.1     General Nature and Purpose of the Plan. The Royal Bank of Canada US Wealth Accumulation Plan (the "Plan") is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the "Company") and its Participating Subsidiaries (collectively, the "Employers") may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year. The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any. The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, and is hereby further amended and restated effective for the Plan Year beginning on January 1, 2008. This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan.

1.2     Definitions.

"Account Balance" means, for any given date, a Participant's Deferred Compensation and Company Contributions, plus or minus the hypothetical investment performance thereon.

"Adverse Benefit Determination" means a claim for benefits by a Participant, beneficiary or personal representative that has been denied in whole or in part.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Cause" means, as determined by the Committee or its assignee, the occurrence of any one of the following: (a) any act of dishonesty, willful misconduct, negligence, gross negligence, intentional or conscious abandonment or neglect of duty; (b) any failure by the Employee to comply with any written policy, rule or code, including but not limited to an Employer's Code of Conduct or Code of Ethics, as applicable; (c) commission of a criminal activity, fraud or embezzlement; (d) violation of any rule or regulation of any self-regulatory agency with which the Employee is licensed, regardless of whether such agency takes disciplinary action against the Employee; (e) the loss or suspension of any license necessary to perform in the occupation for which Employee was hired, or the commission of any action that would cause Employee to become unbondable; (f) a failure to reasonably cooperate in any investigation or proceeding concerning an Employer or any Employer Affiliate; (g) any unauthorized disclosure or use of confidential information or trade secrets; (h) any violation of

any restrictive covenant, such as a non-compete, non-solicit or non-disclosure agreement, between the Participant and an Employer or any Employer Affiliate; (i) personal or professional conduct of Employee which, in the reasonable and good faith judgment of the Committee or its assignee, injures or tends to injure the reputation of an Employer or otherwise adversely effects the interests of an Employer; (j) failure to perform Employee's duties and obligations to a level required by an Employer; or (k) any other act as determined by the Committee in good faith; provided, however, that in the event an Employee is party to an employment agreement with an Employer that contains a different definition of Cause, the definition of Cause contained in such employment agreement will be controlling.

"Change in Control" means the Company's sale of (a) at least 75% of the equity or (b) all or substantially all of the assets of a Participating Subsidiary to a person or entity (or a collection of Persons or entities acting as a group) that is not a Company Affiliate, other Employer or Employer Affiliate. A Change in Control will be deemed to have occurred only if such transaction meets the requirements of a "change in control" (as described in Treasury Regulation § 1.409A-3(i)(5)) with respect to the Participating Subsidiary.

"Code" means the U.S. Internal Revenue Code of 1986, as amended, and includes the regulations and guidance in effect thereunder.

"Committee" means the Head of Human Resources, or those executives designated by the Head of Human Resources to administer this Plan. The members of the Committee, if any, serve at the pleasure of the Head of Human Resources, who have the power to appoint and remove members from time to time.

"Company" means Royal Bank of Canada, a Schedule I bank under the Bank Act (Canada) with its corporate headquarters in Toronto, Ontario, Canada, and any successor or assign.

"Company Contribution" means additional contributions that may be made by the Company in the form of a Matching Contribution or a Discretionary Contribution.

"Deferred Compensation" means, with respect to each Participant, the sum of his or her Voluntary Deferred Compensation and Mandatory Deferred Compensation.

"Disability" means the disability of a Participant as defined in the Qualified Plan, provided, however, that for purposes of Section 5.3(c), a Participant will be considered to have a Disability only if he or she, as determined by a doctor of medicine approved by the Committee, is receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of an Employer because of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

"Discretionary Contribution" means a Company Contribution described in Section 2.6(b).

"Election Form" means the eligible Employee's written election setting forth (a) the percentage of an Employee's Gross Cash Compensation he or she elects to defer, (b) the

-2-

distribution dates for his or her Deferred Compensation and Company Contributions, and (c) such other information as determined by the Committee.

"Employee" means an individual classified as a common law employee by, and on the payroll of, an Employer.

"Employers" means the Company and Participating Subsidiaries.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and includes the regulations and guidance in effect thereunder.

"FICA" means the Federal Insurance Contribution Act.

"Fund Addition Date" means such times as interest or dividends are paid or other distributions are made in connection with a Mutual Fund.

"Gross Cash Compensation" has the meaning ascribed to "Recognized Compensation" under the Qualified Plan on the first day of each Plan Year to which an election to defer compensation relates. Gross Cash Compensation is Recognized Compensation that is earned by an Employee for services rendered during a Plan Year, whether or not paid in such Plan Year, and includes any amounts an Employee contributes to the Qualified Plan or an employer-sponsored cafeteria plan from his or her total compensation. If an Employee so elects at the time of entering into a business transition plan with an Employer, payments from a business transition plan are included in Gross Cash Compensation. The preceding sentence is applicable only for business transition plans entered into on or after January 1, 2007.

"In-Service Payment Date" means a distribution date, as elected by the Employee on his or her Election Form, that occurs while the Participant is an Employee (or an employee of an Employer Affiliate).

"Mandatory Deferred Compensation" means the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee.

"Matching Contribution" means a Company Contribution described in Section 2.6(a).

"Matching Threshold Amount" means an amount of Deferred Compensation, as determined by the Committee with respect to each Plan Year, that is credited to a Participant's account during such Plan Year that may be eligible for a Matching Contribution in accordance with standards and guidelines determined annually by the Committee.

"Mutual Funds" means any of the mutual funds that have been selected by the Committee, as supplemented, replaced or eliminated from time-to-time at the discretion of the Committee.

"Mutual Fund Price" means, unless otherwise determined by the Committee, the daily reported closing price of an interest in, or units of, the Mutual Funds.

-3-

60673594_5

"NYSE" means the New York Stock Exchange.

"Participant" means an individual who has an Account Balance.

"Participating Subsidiary" means a corporation, now or in the future, affiliated with the Company that adopts, or has adopted, the Plan. No corporation may become a Participating Subsidiary without prior consent of the Committee. Such participation is subject to such limitations as the Committee may impose and will cease upon a Change in Control of such Participating Subsidiary.

"Person" means any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, institution, public benefit corporation, entity or government instrumentality, division, agency, body or department.

"Plan" means the Royal Bank of Canada US Wealth Accumulation Plan, as set forth in this document and as amended from time to time.

"Plan Interest Rate" means an interest rate determined from time to time by the Committee.

"Plan Obligor" means the party that is responsible for satisfaction of amounts payable to Participants.

"Plan Year" means, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year.

"Qualified Plan" means the RBC-U.S.A. Retirement and Savings Plan, as amended from time to time.

"Retirement" means the Separation of a Participant whose age and years of employment (as determined using the service rules set forth in the Qualified Plan) with the Employers when combined equals 60.

"Separation" means the separation of employment from the Employers or any Employer Affiliate, as the case may be, of a Participant, other than due to such Participant's death, Disability or termination for Cause pursuant to the terms set forth herein. Transfers of employment among the Employers and their Affiliates will not be a "Separation" for purposes of this Plan, and any Separation must constitute a "separation from service" under Code Section 409A.

"Special Participant" means a Participant who is classified by his or her Employer as a financial consultant in the Private Client Group (as defined by the Employers) and whose production is less than $350,000 per year (or such higher threshold as may be established by the Committee) during the fiscal year ended prior to the Plan Year for which Deferred Compensation is credited.

-4-

Case 4:10-cv-00320   Document 1-1   Filed in TXSD on 02/03/10   Page 8 of 22

"Valuation Date" means the business day that falls on or immediately after July 1 of each year that a distribution is due a Participant.

"Voluntary Deferred Compensation" means the portion or percentage of an Employee's Gross Compensation that the Employee elects to defer to the Plan in accordance with Section 2.2.

1.3     Rules of Interpretation.   Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" mean and refer to this entire Plan and not to any particular paragraph or section of this Plan unless the context clearly indicates to the contrary.  The titles given to the various sections of this Plan are inserted for convenience of reference only and are not part of this Plan and they will not be considered in determining the purpose, meaning or intent of any provision hereof.  Any reference in this Plan to a statute or regulation will be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

## SECTION 2
## DEFERRALS AND DEEMED INVESTMENTS

2.1     Eligibility.

(a)     Employees eligible to participate in the Plan are any of the select group of management or highly compensated employees of an Employer whose compensation or production otherwise exceeds a level deemed appropriate by the Committee and who are invited to become Participants by the Committee.

(b)     No deferrals, Company Contributions or other benefits are available under the Plan, other than deferrals, Company Contributions or other benefits in respect of services rendered to the Employers by an Employee:

(i)     who is a non-resident of Canada for purposes of the Income Tax Act (Canada) throughout the period during which the services were rendered; or

(ii)     other than services that were primarily (A) rendered in Canada; (B) rendered in connection with a business carried on by an Employer in Canada; or (C) a combination of services described in (A) and (B).

2.2     Election to Voluntarily Defer Compensation.   Eligible Employees may enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year.  The Committee has the discretion to limit the amount of Voluntary Deferred Compensation or the amount of Gross Compensation that may be taken into account for making Voluntary Deferred Compensation contributions.  Elections must be made no later than December 31 of the year immediately preceding the year in which such Voluntary Deferred Compensation will be earned; provided, however, that subject to such changes as may be determined by the Committee, a new Employee who is eligible to participate in the Plan has 30 days from such Employee's hiring date to submit an Election Form for such Plan Year.  For a given Plan Year, an election to defer compensation is irrevocable after it is accepted by the

Committee. An election by an Employee who is first eligible to participate in the Plan during a given year becomes effective beginning the first day of the month following the date such Election Form is submitted and accepted by the Committee.

The Committee will from time to time establish the maximum percentage of a Participant's Gross Cash Compensation that he or she may elect to defer under the Plan. Voluntary Deferred Compensation will be deferred by payroll reduction.

2.3     Mandatory Deferral of Compensation. On each payroll date, the Employers will reduce each eligible Employee's Gross Compensation by any Mandatory Deferred Compensation and contribute it to the Plan on such Employee's behalf.

2.4     Election of Investments. On each Plan Year's Election Form, a Participant (or Employee for the first Election Form) may choose the form of the hypothetical investment of his or her Deferred Compensation by electing to credit such deferrals for any Plan Year to one or more of the hypothetical investments established by the Committee. The available hypothetical investments are described in SECTION 3. If a Participant fails to elect how deferrals are deemed to be invested, such Deferred Compensation will be deemed to be invested at the Plan Interest Rate.

Accounts for Participants will be established for bookkeeping purposes only and will not be considered as, or as evidence of the creation of, a trust fund or a transfer or other segregation of assets for the benefit of the Participants or their estates. Such accounts will be established and credited with the appropriate amounts as provided for in the Plan as of the end of each business day, or in the case of any Company Contributions determined after the end of the Plan Year, on or around the last day of February following the end of the Plan Year. Amounts deemed credited to a Participant's account in cash will not be credited with interest, and will not be deemed to be invested in any interest-bearing item.

2.5     Intra-Plan Transfers. Subject to such rules as the Committee, from time to time and in its sole and absolute discretion, may impose, a Participant may elect to have all or a portion of his or her Account Balance transferred to any other type of hypothetical investment (except that, before January 1, 2009, after the initial investment election, no transfer may be made into Company common shares, and Matching Contributions may be transferred from the form of Company common shares only in accordance with Section 2.6(a)(iii)). Participants may initiate an intra-Plan transfer by submitting a request in writing to the Company in such form as the Committee determines. Requests made during any month to transfer Account Balances into another hypothetical investment will be honored at the time/times determined by the Committee.

2.6     Company Contributions. The Committee will establish whether and the extent to which a Participant is eligible for one or more of the following types of Company Contributions:

(a)     Matching Contributions. The Company may make Matching Contributions equal to a percentage of a Participant's Voluntary Deferred Compensation up to the Matching Threshold Amount, subject to the following:

(i)     The Matching Threshold Amount and related Matching Contributions may vary with certain performance-based measures established by

-6-

the Participating Subsidiary, or such other performance factors as determined by the Committee. The Matching Threshold Amount will be based on a performance grid approved annually by the Committee and distributed to each Participant.

(ii)    If a Participant is entitled to a Matching Contribution, after the end of the Plan Year (or at such other time as the Committee, in its sole discretion, determines) his or her account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing the amount of such Matching Contribution by the closing price per Company common share on the NYSE as reported on the day of crediting.

(iii)    Effective January 1, 2009, the Participant may diversify his or her Matching Contributions and related investment returns from a deemed investment in Company common shares at the Participant's Separation, provided that the applicable Employer classifies such Separation as "retirement" on the applicable separation from service forms. For this purpose, classification as "retirement" is not necessarily a "Retirement," as used in this Plan. Prior to January 1, 2009, Participants may not diversify their Matching Contributions and related investment returns.

(b)    *Discretionary Contributions.*  The Company may make Discretionary Contributions in such other amount as determined by the Committee in its sole discretion. The Discretionary Contribution amount may vary from Participant to Participant and may be made based on any criteria, including recommendations from a Participating Subsidiary, as determined by the Committee.    If a Participant is entitled to a Discretionary Contribution, his or her account will be deemed to have been allocated the amount of such Discretionary Contribution on the date determined by the Committee. Such Discretionary Contribution will be invested as determined by the Committee in its discretion, but may be based on any election by such eligible Participant, and may be changed by the Participant at any time; provided that Discretionary Contributions invested in Company common shares may be diversified only after January 1, 2009.

## SECTION 3
## INFORMATION CONCERNING INVESTMENT ALTERNATIVES

### 3.1    Company Common Shares.

(a)    *Company Common Shares.*  For any Plan Year, in connection with a Participant's election to have a portion of his or her Deferred Compensation credited toward Company common shares, such Participant's account will be deemed to have been allocated the number of Company common shares, including fractional shares, resulting from dividing such portion of the Participant's Deferred Compensation and Company Contributions allocated to the investment in Company common shares by the closing price per Company common share on the NYSE as reported on the day of crediting.

-7-

(b)     *Dividends on Company Common Shares.* At such times as the Company declares dividends on its common shares, an amount equal to the number of Company common shares credited to a Participant's account on the record date multiplied by the declared dividend per share in U.S. dollars (such dividend to be calculated without taking into account any and all Canadian withholding taxes to which such dividend might be subject, if actually paid) will be credited, on the payment date, to such Participant's account in cash (if dividends are paid in cash) or in Company common shares (if dividends are declared in common shares), or in such other property determined by the Committee.

(c)     *Additional Purchases of Company Common Shares.* All amounts credited to a Participant's account as a result of cash dividends will be used on a daily basis (or on such other date as determined by the Committee in its sole discretion) to purchase hypothetical Company common shares. The number of additional Company common shares credited to each Participant's account after the end of each day due to the hypothetical purchases described in this paragraph will be equal to the number of Company common shares, including fractional shares, derived by dividing the total amount of cash credited to the Participant's account as described in this Section 3.1 by the closing price per Company common share on the NYSE as reported on the date of the hypothetical purchase of the Company common shares credited to such Participant's account under this Section 3.1.

3.2     Plan Interest Rate.  Participants may elect to have all or a portion of their Deferred Compensation invested at the Plan Interest Rate.

3.3     **Mutual Funds.**

(a)     *Mutual Funds.* A Participant may elect to have all or a portion of their Deferred Compensation, Discretionary Contributions, and, effective January 1, 2009, Matching Contributions after a Separation classified by an Employer as a "retirement" deemed invested in a Mutual Fund. A Participant's account will be allocated the number of units (including fractional units) of a Mutual Fund equal to the portion of his or her Account Balance allocated to investments in Mutual Funds divided by the Mutual Fund Price.

(b)     *Interest or Dividends on Mutual Funds.* On each Fund Addition Date, a determination will be made as to the number of units (including fractional units) of the Mutual Fund that will be credited to a Participant's account as of the Fund Addition Date. On the Fund Addition Date, an amount equal to the number of units of the Mutual Fund credited to a Participant's account multiplied by the amount of the interest or dividend per unit of the Mutual Fund will be credited to such Participant's account, or other fund determined by the Committee. Interest payments or other distributions will be deemed reinvested in additional units of the Mutual Fund at prevailing market prices on the Fund Addition Date.

60673594_5

3.4 **Valuation.** Except for changes resulting from intra-Plan transfers described in Section 2.5, the notional value of a Participant's accounts will be updated daily to reflect any increases or decreases in the value of the Participant's hypothetical investment.

The account of a Participant with a hypothetical investment in Mutual Funds will be debited by an amount representing a quarterly fee. The amount of the quarterly fee will be determined by multiplying the value of the Participant's hypothetical investment in Mutual Funds, as described above, by a decimal determined by the Committee, which for 2008 is 0.000625. The Committee will from time to time review this calculation and may change the decimal factor used in this calculation.

## SECTION 4
## VESTING

4.1 **Vesting of Voluntary Deferred Compensation.** All Voluntary Deferred Compensation recorded in a Participant's account will be fully vested at all times.

4.2 **Vesting of Mandatory Deferred Compensation and Company Contributions.** Mandatory Deferred Compensation and Company Contributions in a Participant's account will vest on the date or dates determined by the Committee, in its sole discretion. The Committee will announce any prospective change in the vesting schedule with respect to Mandatory Deferred Compensation and Company Contributions (and the related investment returns, if any) prior to December 31 of the year preceding each new Plan Year. Unless otherwise amended by the Committee, all time period measurements for the vesting schedules established by the Committee will begin on January 1 of the Plan Year following the Plan Year to which a Company Contribution relates. Notwithstanding the foregoing, a Participant's Mandatory Deferred Compensation and Company Contributions will immediately vest in full upon:

(a) the death or Disability of such Participant while an employee of an Employer or an Employer Affiliate; or

(b) the Separation of a Participant, who prior to Separation and with the consent of his or her Employer, has (a) entered into a business transition agreement with the Private Client Group or (b) met the requirements under the Plan for Retirement and who has entered into a non-competition, non-solicitation and related agreement at the request of the Participant's employer in the form then approved by the Committee. The non-competition agreement will require a Participant, for at least a one-year period, to refrain from participating, directly or indirectly, in any business in which an Employer is engaged at the time of such Participant's Separation in any geographic area in which the Employer, as appropriate, is competing at such time.

4.3 **Termination For Cause.** Notwithstanding anything to the contrary in this SECTION 4, if a Participant is involuntarily terminated for Cause from an Employer or an Employer Affiliate at any time prior to the distribution of his or her Account Balance, upon such Participant's Separation all of his or her Mandatory Deferred Compensation and Company Contributions will be forfeited, regardless of whether the vesting schedule has otherwise been satisfied with respect to such shares or assets, and the proceeds thereof will be deemed returned to

-9-

the Company. The Committee has full discretionary authority to determine whether a Participant was terminated for Cause, and, if (x) a Participant has a voluntary Separation, and (y) the Committee thereafter determines that the Participant could have been involuntary terminated by an Employer or Employer Affiliate for Cause, then the Participant will be treated as though he was involuntarily terminated for Cause for all purposes of this Plan.

4.4      Terminations Due to Restructuring.  In the event a Participant ceases to be employed by the Employers and their Affiliates due to an organizational restructuring (as determined in the sole discretion of the Committee), all Mandatory Deferred Compensation in such Participant's account will become vested, but all unvested Company Contributions will be forfeited.

4.5      Change in Control.      In the event of a Change in Control of a Participating Subsidiary, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (as determined by the Committee), is no longer employed by an Employer immediately after the Change in Control will become vested in his or her Mandatory Deferred Compensation and Company Contributions as follows:

(a)      *Minimum Vesting.*  The unvested portion of each affected Participant's Mandatory Deferred Compensation and Company Contributions will be vested pro rata, based on the period of time that has elapsed from the effective date of the contribution to the date of the Change in Control relative to the total vesting period related to such contribution.      Before a Change in Control event, the Committee will establish a reasonable method for calculating the pro rata portion of each affected Participant's Account Balance.

(b)      *Discretionary Vesting.*  The Board has the discretionary authority to vest any amount held in an affected Participant's account that remains unvested after the application of paragraph (a) above. In making its determination, the Board may consider the terms of the transaction governing the Change in Control, the financial impact on the Employers, and any other factors it deems relevant to its determination.

4.6      Forfeitures.      Except as otherwise specifically set forth herein, all Company Contributions and Mandatory Deferred Compensation and related deemed investment returns that are not vested on the Participant's Separation date will be deemed forfeited, and such Participant's account will be appropriately reduced.

## SECTION 5
## DISTRIBUTIONS

5.1      Distributions.  Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant will also make an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.

5.2      Distribution Dates for Special Participants.  Notwithstanding anything to the contrary in Section 5.1 or 5.3, but subject to Section 5.4, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant is a Special

-10-

60673594_5

Participant will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made. The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.

5.3     Distribution Dates for Other Participants.

(a)     *Distribution Pursuant to the In-Service Payment Date.* If the Participant selected an In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Committee may impose, distributions will be made in a single payment in the specified year promptly after, but in no event after the 90th day following, July 1 of such year. With the consent of the Committee, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Committee and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

(b)     *Distribution on Separation or Retirement.*

(i)     If (A) the Participant elected payment on Separation on his or her Election Form or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Committee may impose, the Participant's Account Balance will be distributed due to Separation, less any amount owed by the Participant to an Employer at the time of Separation pursuant to a promissory note or otherwise incurred in the normal course of business; provided, however, that any offset is limited to $5,000 and will occur at the same time and in the same amount as the debt otherwise would have been paid by the Participant.

(ii)     If distribution is made due to Separation, distributions will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election Form. Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years.

(iii)     Any single lump sum payment and the first installment of any series of installment payments will be made promptly after, but in no event after the 90th day following, the July 1 of the Plan Year that begins following the year of Separation, and each annual installment will occur promptly after, but in no event after the 90th day following, the July 1 of each year thereafter. Subject to reduction as set forth in clause (i) above, each installment will be equal to a fraction of all vested amounts deemed allocated to the Participant's account, the numerator of such fraction being one and the denominator being the number of installments remaining to be paid. For example, if the Participant has elected five annual installments, the first installment will be equal to one-fifth of the Participant's total vested Account Balance on the date such Account Balance is valued for purposes of the first payment date and the second installment will be

-11-

equal to one-fourth of the Participant's account on the date such account is valued for purposes of the second payment date, etc.

(iv)     If the Participant did not indicate a distribution date on his or her Election Form, or if the Election Form was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 immediately after the date of vesting.

(v)     Distributions pursuant to this section will be made pro-rata from all of a Participant's hypothetical investments.

(vi)     For purposes of Code Section 409A, each installment payment will be treated as a separate single payment.

(c)     *Distributions Following Death or Disability.*     Distributions following death will follow the procedures set forth in Section 5.6.  Distributions following Disability will be made in a single payment to the Participant promptly after, but in no event after the 90th day following, the date the Participant satisfies the definition of Disability.

(d)     *Other.*  The Committee reserves the right to distribute accounts and terminate participation of Participants who transfer employment outside of the United States; provided, however, that no acceleration of distribution will be made in contravention of Code Section 409A.

5.4     **Distribution Due to a Change In Control.**  If, as a result of a Change in Control, a Participant's employer that is a Participating Subsidiary ceases to be a Participating Subsidiary under the Plan, each Participant who is employed by such Participating Subsidiary immediately prior to the date on which the Change in Control is consummated and who, due to the Change in Control (at the determination of the Committee), is no longer employed by a Participating Subsidiary immediately after the Change in Control will receive his or her vested Account Balance on the date on or promptly after, but in no event after the 90th day following, the date the Change in Control is consummated; provided, however, that, for purposes of complying with Code Section 409A, no payment under this Section 5.4 will be made before January 1, 2009.

5.5     Form of Distributions.

(a)     *Distributions of Company Common Shares.*

(i)     All distributions of hypothetical investments in Company common shares will be in the form of Company common shares, less the number of common shares equal to the minimum amount necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes.  Any Company common shares distributed under the Plan will be Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued Company common shares;

-12-

(ii)     The value of each Company common share credited to a Participant's account will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date; and

(iii)    All distributions will be in the form of whole Company common shares. Fractional shares, if any, will be distributed in cash.

(b)     *Distributions of Investments in Mutual Funds.* A Participant's hypothetical investment in mutual funds will be distributed in cash, less the amount of cash necessary to satisfy withholding requirements with respect to all applicable federal, state and local taxes. The value of a Participant's hypothetical investment in Mutual Funds will be determined by multiplying the total number of units of the Mutual Fund credited to the Participant's account by the Mutual Fund Price, in each case, measured as close as practicable to the Valuation Date.

(c)     *Distributions of Investment in the Plan Interest Rate.* A Participant's hypothetical investment in the Plan Interest Rate will be distributed in cash, less the amount of cash needed to satisfy withholding requirements with respect to all applicable federal, state and local taxes.

Notwithstanding Section 5.5(b) or (c), as applicable, the Committee, in its sole and absolute discretion, may cause distributions with respect to a Participant's Account Balance to be made, at the Company's option, in Company common shares that have been previously issued and that are currently trading in the market, or, subject to the approval of the Board of Directors of the Company and any required regulatory and shareholder approvals, authorized but previously unissued shares; the value of all such shares will be equal to the closing price per Company common share on the NYSE as reported for the Valuation Date.

5.6     **Distributions to Beneficiaries.**     Distribution of the Account Balance of a Participant who dies before any payment to such Participant is made will be made to such Participant's beneficiary or the Participant's estate in a single lump sum as of the date of the Participant's death. If the Participant dies after payments have commenced but before distribution is completed, the Participant's remaining Account Balance will be distributed to the Participant's beneficiary in lump sum after the Participant's death.  For purposes of complying with Code Section 409A, such distribution will occur by the end of the calendar year in which the death occurs or by the fifteenth day of the third month following the date of death, if later. Notwithstanding the foregoing sentence, if the Committee is not timely notified of the death of the Participant and therefore cannot reasonably begin or make payments by the distribution deadline required by Code Section 409A, a lump sum distribution will be made to the beneficiary as soon as possible following the Committee's receipt of the death notification, subject to any tax, interest, and penalties imposed by Section 409A.

5.7     **Designation of Beneficiary.** Each Participant has the right to designate in writing, in form satisfactory to the Committee, one or more beneficiaries to receive the unpaid vested balance of the Participant's account in the event of such Participant's death, and may change or revoke any prior beneficiary designation by a similar instrument in writing. Any beneficiary designation must be received by the Committee before the Participant's death. Any beneficiary

-13-

designation of a Participant's spouse will be made void in the event of a divorce, unless either a binding court order provides otherwise or the Participant redesignates his or her former spouse as the beneficiary. If a Participant fails to designate a beneficiary or, having revoked a prior beneficiary designation, fails to designate a new beneficiary, or in the event the Participant's beneficiary designation fails, in whole or in part, by reason of the prior death of a designated beneficiary, divorce or for any other cause, then the undistributed vested balance of the Participant's account, or the portion thereof as to which such designation fails, as the case may be, will be paid to the Participant's estate.

5.8     **Disclaimers by Beneficiaries.** A beneficiary entitled to a distribution of all or a portion of a deceased Participant's accounts may disclaim his or her interest therein subject to the following requirements. To be eligible to disclaim, a beneficiary must be a natural person, must not have received a distribution of all or any portion of such accounts at the time such disclaimer is executed and delivered, and must have attained at least 21 years of age as of the date of the Participant's death. Any disclaimer must be in writing and must be executed personally by the beneficiary before a notary public. A disclaimer will state that the beneficiary's entire interest in the undistributed accounts is disclaimed or will specify what portion thereof is disclaimed. To be effective, duplicate original executed copies of the disclaimer must be both executed and actually delivered to the Committee after the date of the Participant's death but not later than 180 days after the date of the Participant's death. A disclaimer will be irrevocable when delivered to the Committee. A disclaimer will be considered to be delivered to the Committee only when actually received by the Committee. The Committee will be the sole judge of the content, interpretation and validity of a purported disclaimer. Upon the filing of a valid disclaimer, the beneficiary will be considered not to have survived the Participant as to the interest disclaimed and any distribution made to the beneficiary will be reversed. A disclaimer by a beneficiary will not be considered to be a transfer of an interest in violation of the provisions of SECTION 6 and will not be considered to be an assignment or alienation of benefits in violation of any law prohibiting the assignment or alienation of benefits under this Plan. The Committee will not recognize any other form of attempted disclaimer.

5.9     Federal Income Tax.

(a)     *Tax Consequences of Participating in the Plan.* The Plan provides that the election to defer any portion of a Participant's compensation, and the establishment of a fixed date or schedule for payment, is made prior to the performance of the personal services for an Employer to which the compensation relates. Accordingly, the Company believes that Participants are not expected to recognize either the deferred amounts or the Company Contributions as ordinary income for federal income tax purposes until such amounts are actually paid or distributed to them by the Company; provided, that, such amounts may still be subject to FICA taxes when deferred to the Plan. Similarly, the Company is not expected to be allowed any income tax deduction on account of the Plan until, and for its taxable year in which, a Participant recognizes ordinary income hereunder, to the extent such amount satisfies the general rules concerning deductibility of compensation. As described above and in Section 5.10 below, it is expected that the Company will be required to withhold or otherwise collect income and other payroll taxes upon such amounts as required under Code Section 3402 and certain other Code sections.

-14-

(b)    *Compliance with Code Section 409A.* Except as specifically provided in Section 5.6, it is intended that any income or payments to a Participant provided pursuant to this Plan will not be subject to the additional tax and interest under Code Section 409A. The provisions of the Plan will be interpreted and construed in favor of complying with any applicable requirements of Code Section 409A necessary to avoid the imposition of additional tax, interest or penalties under Code Section 409A.

(c)    *Participants Should Consult Their Tax Advisors.* Due to the complexity of the applicable provisions of the Code, this summary of certain federal income tax consequences sets forth only the general tax principles affecting the Plan. These general tax principles are subject to changes that may be brought about by subsequent legislation or by regulations and administrative rulings, which may be applied on a retroactive basis. Neither the Company nor any Participating Subsidiary has obtained, and as a result of various provisions the Plan is not eligible for, a ruling from the Internal Revenue Service regarding the federal income tax consequences associated with participation in the Plan. Participants may be subject to state or local income taxes as a result of their election to defer compensation pursuant to the Plan, and Participants should refer to the applicable laws in those jurisdictions. Accordingly, each Plan Participant should consult his or her own tax counsel on questions regarding tax liabilities arising upon any election to defer compensation pursuant to the Plan and any distributions made to such Participant pursuant to the Plan.

5.10   Tax Withholding. All distribution payments will be treated as wages for tax purposes and therefore will be made net of all applicable income, FICA (to the extent not already withheld at the time of deferral), payroll and other taxes required to be withheld. In connection with any event that gives rise to a federal or other governmental tax withholding obligation on the part of the Company or any of its Affiliates relating to amounts under the Plan (including, without limitation, FICA tax), (a) a Participant's employer may deduct or withhold (or cause to be deducted or withheld) from any payment or distribution to a Participant, whether or not pursuant to the Plan, or (b) the Committee will be entitled to require that the Participant remit cash to the Company, his or her employer or any of its Affiliates (through payroll deductions or otherwise), in each case in an amount sufficient in the opinion of the Company to satisfy such withholding obligations. Further, as permitted under Treasury Regulation § 1.409A-3(j)(4)(vi), the distribution of an Participant's account may be accelerated to satisfy employment taxes and wage withholding at the source.

5.11   ERISA Matters. Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an "employee pension benefit plan" as defined by ERISA. If the Plan is determined to be an "employee pension benefit plan," the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements. A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

60673559A_5

## SECTION 6
## SPENDTHRIFT PROVISIONS

Neither any Participant nor the personal representative of any Participant has any transferable interest in the Participant's account or any right to anticipate, alienate, dispose of, pledge or encumber the same prior to actual receipt of payments in accordance with the rules described in SECTION 4 and SECTION 5, nor will the same be subject to attachment, garnishment, execution following judgment or other legal process instituted by creditors of the Participant or the personal representative of the Participant.

## SECTION 7
## ADMINISTRATION

7.1     The Committee.   The Plan will be administered by the Committee.   The Committee has the full power and sole discretionary authority to make all determinations provided for in the Plan, including, without limitation, promulgating rules and regulations as the Committee considers necessary or appropriate for the implementation and management of the Plan as well as rules to address potential conflicts of interest and determination of a termination of employment due to Cause under Section 4.3; provided that the Board of Directors of the Company also has the full power and discretionary authority to make determinations with respect to the Plan having the effect of materially increasing the cost of the Plan to an Employer, including, without limitation, decisions regarding Company Contributions, eligibility to participate in the Plan, and discretionary vesting in the event of a Change in Control (as described in Section 4.5(b)).

7.2     Claims Procedure.   If any Participant or his or her estate is in disagreement with any determination that has been made for payment under this Plan, a claim may be presented to the Committee in accordance with procedures set forth in this SECTION 7.

7.3     Making a Claim.   The claim must be written and must be delivered to the Committee within 90 days the Participant or beneficiary knows or should have known of his or her claim for benefits.   Within 90 days after the claim is delivered, the claimant will receive either: (a) a decision or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day the claims as delivered) to reach a decision.

In the event of an Adverse Benefit Determination, the claimant will receive a written or electronic notice specifying: (a) the reasons for the determination; (b) the Plan provisions on which the Adverse Benefit Determination is based; (c) any additional information needed in connection with the claim and the reason such information is needed; and (d) a description of the Plan's review procedures, including a statement of the Participant's right to bring a civil action under ERISA Section 502(a) following an Adverse Benefit Determination upon appeal.   Notice of the claimant's right to request a review (as described in Section 7.4) will also be given to the claimant.

7.4     Requesting Review of a Denied Claim.   A claimant may request that a denied claim be reviewed.   The request for review must be written and must be delivered to the

-16-

Committee within 60 days after claimant's receipt of written or electronic Adverse Benefit Determination. A request for review may (but is not required to) include issues and comments that the claimant wants considered in the review, even if such information was not provided in the initial request for benefits. The claimant may examine pertinent Plan documents, including the records and other documentation, by asking the Committee for such documents. Within 60 days after delivery of a request for review, the claimant will receive either: (a) a decision; or (b) a notice describing special circumstances requiring a specified amount of additional time (but no more than 120 days from the day the request for review was delivered) to reach a decision.

The Committee may require the claimant to submit such additional facts, documents or other material as it deems necessary or advisable in making its review. The Committee will notify the claimant in writing or electronically of its decision. If the Adverse Benefit Determination is confirmed in whole or in part, the communication will set forth: (a) the specific reasons for the decision; (b) the specific references to the Plan provisions on which the decision is based; (c) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of all documents, records, or other information relevant to the claim; and (d) a statement regarding the claimant's right to bring an action under ERISA Section 502(a).

7.5     In General. All decisions on claims and on reviews of denied claims will be made by the Committee. The Committee also reserves the right to delegate its authority to make decisions. The Committee may, in its discretion, hold one or more hearings. If a claimant does not receive a decision within the specified time, the claimant should assume the claim or appeal was denied on the date the specified time expired. The claimant may, at the claimant's own expense, have an attorney or other representative act on behalf of the claimant, but the Committee reserves the right to require a written authorization.

No action at law or in equity may be brought to recover benefits or otherwise enforce the provisions of the Plan unless the Participant or beneficiary has exhausted all remedies under this SECTION 7. Any action brought after exhaustion of such remedies must be brought within ninety (90) days after the Participant or beneficiary has received final notice of an Adverse Benefit Determination under Section 7.4.

## SECTION 8
## OTHER ADMINISTRATIVE MATTERS

8.1     Reporting. As soon as administratively feasible after each calendar quarter end, the Company will prepare and make available to each Participant a report showing (a) the amounts credited to the Participant's account since the last report from the Company, and (b) the amounts of any distributions made since the last report. At its discretion, the Company may prepare and make available more frequent reports to Participants.

8.2     Plan Obligor; Status as Unsecured General Creditors.

(a)     The Company will be the Plan Obligor with respect to distributions from all accounts; provided, however, that the Participant's Participating Subsidiary will be the

-17-

60673594_5

Plan Obligor with respect to investments of Mandatory Deferred Compensation and related Company Contributions thereon, except as set forth in Section 8.2(b) below.

(b)     The Company will be the Plan Obligor with respect to all accounts of Participants who are residents, for tax purposes, in California and Arizona during the Plan Year.

(c)     All Participants are general unsecured creditors of the relevant Plan Obligor with respect to amounts payable pursuant to distributions from the accounts described in (a) and (b) above.

As such, Participants and their estates will not have any secured or preferred interest by way of trust, escrow, lien or otherwise in any specific assets of the Employers. The Plan does not require that any hypothetical investments under this Plan be funded by the Company. If a Plan Obligor, in fact, elects to set aside monies or other assets to meet its obligations under the Plan (there being no obligation to do so) through the creation of a trust or otherwise, such monies or other assets will be subject to the claims of its general creditors, and neither any Participant nor any beneficiary of any Participant will have a legal, beneficial or security interest therein.

8.3     Disclaimer of Employment and Bonus Rights.   The Plan is not a contract for employment and does not grant any employee the right to be retained in the employment of the Employers or to obtain any compensation. Upon dismissal or severance of employment, no Participant will have any right or interest under the Plan, other than as specifically provided herein.

8.4     Administrative Expenses of the Plan.   Participants will be responsible for all administrative expenses incurred with respect to this Plan and for all administrative expenses and other fees of this Plan (to the extent such expenses are not paid by the Company), including the costs of outsourced record-keeping (which expenses will be deducted proportionately among Participants' accounts).

8.5     No Compensation Under the Qualified Plan.   Unless the Qualified Plan specifically provides otherwise, no amounts of Deferred Compensation and related Company Contributions, if any, credited to any account of a Participant will constitute "Recognized Compensation" for purposes of the Qualified Plan, as such terms are defined in such plan, nor any other employee benefit plan of the Company or its Affiliates.

8.6     Voting Rights.   Participants' accounts under the Plan are bookkeeping accounts and, accordingly, Participants will not have any voting rights with respect to any common shares or any units or other interests in Mutual Funds deemed allocated to any Participant's account.

8.7     Governing Law.   This instrument has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that state to the extent not preempted by federal law and will be construed and enforced in accordance with the laws of the State of Minnesota.

-18-

60673594_5

## SECTION 9
## AMENDMENT OR TERMINATION

9.1     Amendments to and Termination of Plan. While the Company intends for the Plan to continue indefinitely, it may be amended or terminated at any time by the Committee or the Board of Directors of the Company or by the Company, including, without limitation (a) to ensure that neither the Plan Obligors nor the Participants are subject to adverse Canadian or United States tax consequences and (b) to modify the form of distribution of Participants' accounts; provided, however, that no such amendment or termination will have the effect of (i) reducing the vested portion of amounts already credited to a Participant's account; (ii) extending the time of distribution of such Participant's accounts, without the consent of such Participant and only in a manner permitted by Code Section 409A; or (iii) causing a violation of Code Section 409A. In the event of a termination of the Plan, all accounts will be deemed vested and amounts credited thereto will be distributed to Participants in accordance with the distribution guidelines under Code Section 409A.

9.2     Merger. The Committee may cause all or part of this Plan to be merged with all or a part of any other nonqualified deferred compensation plan maintained by any company. If the Committee agrees to such a merger, the Committee will specify in writing the terms and conditions of such merger and may obtain such consents and agreements as it deems necessary or desirable.

9.3     Applicability to Successors. This Plan will be binding upon and inure to the benefit of the Company and to the extent that the Company is a Plan Obligor under the Plan for any accounts, the Participating Subsidiaries, their successors and assigns, each Participant, his or her personal representatives and any beneficiaries. If the Company becomes a party to any merger, consolidation or reorganization, this Plan will remain in full force and effect as any obligation of the Company or its successors in interest.

-19-

60673594_5

From:   RBC US Retirement Benefits Department
Sent:   Tuesday, September 23, 2008 4:33 PM
Cc:     Sorenson, Lisa (RBC Wealth Mgmt)
Subject:   2009 Eligibility Changes to RBC Wealth Accumulation Plan (WAP)

As a "top hat" plan, the RBC Wealth Accumulation Plan (WAP) is a nonqualified retirement plan limited to a select group of employees and is exempt from some ERISA regulations. In order to maintain this status and ensure that WAP is available only to a select group on an ongoing basis, modifications to participant eligibility are required for 2009.

The WAP eligibility cash compensation threshold is increasing from $150,000 to $350,000. To be eligible to participate in the 2009 WAP, you must reach the minimum eligibility level of $350,000 in cash compensation which is calculated from October 1st 2007 to September 30th, 2008. If you meet eligibility requirements, you will receive 2009 WAP enrollment information in November.

If you have participated, or currently are participating in the WAP and are no longer eligible because of these threshold changes, this is not a reflection of your value to the company. These changes are required to ensure the plan's ongoing "top hat" status. Also, be assured that any balances you have in the WAP will be unaffected by this change and will continue to be treated under the terms and conditions of the Plan.

The current WAP eligibility level has been in place since 2004. Following the 2009 eligibility threshold increase, the WAP committee will continue to monitor and change eligibility requirements in future years as necessary to help ensure the longevity of the plan.

If you have general questions about the WAP, email the RBC US Benefits Department (click on the link or reply to this email) or call the US HRSC Contact Center at 866-477-3783.

1

EXHIBIT

B