IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA TOLBERT, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Civil Action No. H-11-0107 |
| | § | |
| RBC CAPITAL MARKETS | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment (Docket Entry No. 84), Defendants' Motion for Summary Judgment (Docket Entry No. 91), and Plaintiffs' Motion to Re-Urge Class Certification (Docket Entry No. 116). The parties filed various responses, replies, surreplies, and supplements to these pending motions.

Based on careful consideration of the motions, responses, replies, surreplies, supplements, summary judgment evidence, the record, and the applicable law, the Court **GRANTS** Defendants' Motion for Summary Judgment (Docket Entry No. 91), **DENIES AS MOOT** all remaining motions, and **DISMISSES** this lawsuit for the reasons that follow.

## I. BACKGROUND AND CLAIMS

The parties agree that plaintiff Brenda Tolbert was employed by Defendant RBC or its predecessors from December 1971 until August 2009. In 2001, RBC established the voluntary Royal Bank of Canada Wealth Accumulation Plan for certain employees; at the time Tolbert's employment ended, the plan was known as the Amended and Restated Wealth

Accumulation Plan (the "WAP"). The WAP was administered by a committee, which was RBC's head of human resources or executives designated by the head of human resources (the "Committee"). Tolbert participated in the WAP from 2003 until her employment was terminated for cause in August of 2009.[1]

Under the WAP, specified amounts of mandatory and voluntary deferred compensation were placed in each employee participant's account, with RBC making matching contributions and discretionary contributions as the Committee deemed appropriate. A participant's voluntary deferred compensation was fully vested at all times. Mandatory deferred compensation and company contributions vested as determined by the Committee, in its sole discretion, but became immediately and fully vested upon the participant's death or disability, or upon the voluntary and agreed termination of the participant's employment under certain specified conditions. However, if the participant's employment was terminated for cause prior to distribution of the participant's account balance, as in Tolbert's case, then the mandatory deferred compensation and company contributions were forfeited and the funds reverted back to RBC.

At issue in the pending dispositive motions is whether Tolbert is entitled to approximately $27,000.00 in company contributions that were forfeited from her WAP account following the termination of her employment for cause. Tolbert contends that the WAP was an employee pension benefit plan covered by ERISA, and that she is entitled to

---

[1]The propriety of Tolbert's termination for cause is not an issue in this lawsuit.

the $27,000.00 as vested and accrued employee benefits that could not be forfeited under ERISA. Defendants, however, argue that the WAP was not an employee pension benefit plan covered by ERISA and, even assuming that it were, it was an unfunded "top hat" plan exempt from ERISA's non-forfeiture provisions.[2] Tolbert, in turn, argues that the WAP was not a valid top hat plan.

In their Motion for Partial Summary Judgment (Docket Entry No. 84), Plaintiffs[3] move the Court to reject Defendants' affirmative defenses and declare that the WAP was not a valid top hat plan. In their Motion for Summary Judgment (Docket Entry No. 91), Defendants move for summary judgment on grounds that the WAP was not an employee pension benefit plan. Because this latter issue underlies all other pending issues, the Court must first determine whether the WAP was an employee pension benefit plan under ERISA. Only if the WAP is governed by ERISA need the Court address the parties' other issues, including consideration of the parties' top hat claims.

---

[2] A "top hat" plan is an unfunded ERISA plan maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. *See* 29 U.S.C. § 1101(a)(1). Top hat plans are exempt from certain ERISA fiduciary and non-forfeiture provisions.

[3] Plaintiffs Lawrence Gift, Jr., and Joseph Rice Neuhaus, Jr., voluntarily terminated their employment with RBC in 2011 and joined this lawsuit after the filing of the pending dispositive motions. (Docket Entry No. 98.) They expressly joined in all pleadings, motions, and arguments filed and raised by Tolbert in this lawsuit, including the instant motions. (Docket Entry No. 94.)

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted if the pleadings, depositions, and affidavits submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues which the nonmoving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the nonmoving party's claim. *Id.*

Once the movant produces such evidence, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue of material fact requiring a trial. *Id.* The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Little*, 37 F.3d at 1075. If no issue of fact is presented and if the movant is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the nonmoving party. *Id.*

4

The Fifth Circuit has held that the existence of an ERISA plan within the statutory definition is a question of fact; however, where the relevant factual circumstances are established as a matter of law or are undisputed, the question becomes one of law. *House v. Am. United Life Ins. Co.*, 499 F.3d 443, 448 (5th Cir. 2007). The burden of proving that a plan is covered by ERISA falls on the party asserting such allegation. *See Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (5th Cir. 1980). Plaintiffs and Defendants contend that the Court can determine the WAP's ERISA status as a matter of law under the facts of this case. (Docket Entries No. 93, p. 32; No. 91, p. 47.)

## III. ANALYSIS

ERISA does not regulate all benefits paid by an employer but only those paid pursuant to an "employee benefit plan," including "employee pension benefit plans." *Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339, 344 (5th Cir. 2003). An "employee pension benefit plan" is defined under ERISA as:

> any plan, fund or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program –
>
>     (i)      provides retirement income to employees, or
>
>     (ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution

is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution.

29 U.S.C. § 1002(2)(A). In short, an employee pension plan covered by ERISA is a plan established or maintained by an employer that provides retirement income or results in a deferral of income until time of termination or beyond.

Plaintiffs contend that the WAP was an employee pension benefit plan under ERISA; Defendants contend that the plan was a non-ERISA deferred income and/or tax-savings program. The parties' dispute specifically focuses on the following language of section 1002(2)(A): "to the extent that *by its express terms* or *as a result of surrounding circumstances* such plan, fund, or program – (i) *provides retirement income* to employees, or (ii) *results in a deferral of income by employees for periods extending to the termination of covered employment or beyond.*" Thus, this Court must determine if the WAP, by its express terms or as a result of surrounding circumstances, provided retirement income to participants or resulted in the deferral of income for periods extending to, or after, termination of employment.

To this end, an in-depth review of the WAP itself is necessary.[4]

_____

[4]In their First Amended Class Action Complaint, Plaintiffs specifically base their claims on the Amended and Restated US Wealth Accumulation Plan dated November 1, 2008, attached to the First Amended Class Action Complaint as Exhibit "A,"and they consistently refer to this instrument as "the WAP" for purposes of this lawsuit. (Docket Entry No. 24, pp. 4–5.) Thus, the Court has not included in its analysis any subsequent versions of the WAP that may have been promulgated.

In setting forth its general nature and purpose, the WAP expressly stated as follows:

The Royal Bank of Canada US Wealth Accumulation Plan (the 'Plan') is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of the Royal Bank of Canada (the 'Company') and its Participating Subsidiaries (collectively, the 'Employers') may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.[5] The Plan is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in the Company's growth and profitability, if any.

(Docket Entry No. 24, Exhibit A.) The WAP made the following key disclosure:

Although the Plan is not intended to be a tax-qualified plan under Code Section 401, the Plan might be determined to be an 'employee pension benefit plan' as defined by ERISA. If the Plan is determined to be an 'employee pension benefit plan,' the Company believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements. A statement has been filed with the Department of Labor to comply with ERISA reporting and disclosure requirements.

*Id.*

The November 1, 2008, version of the WAP, which was in effect at the time of

Tolbert's termination from employment,[6] established two types of deferred compensation:

---

[5]"Plan Year" meant, with respect to a particular year, the 12-month period beginning January 1 and ending December 31 of such year. (Docket Entry No. 24, Exhibit A, p. 39.)

[6]Section 1.1 also stated the following: "The Plan was formerly known as the RBC Dain Rauscher Wealth Accumulation Plan, was amended and restated effective for the Plan Year beginning on January 1, 2005, was further amended and restated effective for the Plan Year beginning on January 1, 2007, and is hereby further amended and restated effective for the Plan Year beginning on January 1, 2008. *This Plan restatement supersedes all prior versions of the Plan and any deferrals or contributions made pursuant to a prior version of the Plan will be governed by this Plan.*" (Docket Entry No. 24, Exhibit A, p. 14.)

mandatory deferred compensation and voluntary deferred compensation, and two types of company contributions: matching contributions and discretionary contributions. Mandatory deferred compensation meant "the percentage of an Employee's Gross Compensation that the Committee may, from time to time and in its sole and absolute discretion, designate as a required deferral to the Plan for such Employee." *Id.*, p. 38. Voluntary deferred compensation meant "the portion or percentage of an Employee's Gross Compensation that the Employee elects to defer to the Plan in accordance with Section 2.2." *Id.*, p. 40. Matching contributions were defined as contributions that RBC could make to a participant's account, "equal to a percentage of a Participant's Voluntary Deferred Compensation," up to a matching threshold amount. *Id.*, p. 41. Discretionary contributions were defined as contributions that RBC could make "in such other amount as determined by the [WAP] Committee in its sole discretion." *Id.*, p. 42.

Pursuant to the WAP, all voluntary deferred compensation in a participant's account was fully vested at all times. *Id.*, p. 44. Mandatory deferred compensation and company contributions vested as determined by the Committee, in its sole discretion, and as announced on an annual basis. *Id.*, p. 44. However, a participant's mandatory deferred compensation and company contributions immediately and fully vested upon the participant's death or disability, or the voluntary and agreed termination of the participant's employment under certain specified conditions. *Id.* If the participant's employment was terminated for cause prior to the distribution of his account balance, then his or her mandatory deferred

8

compensation and company contributions were forfeited and the funds reverted back to RBC. *Id.*, pp. 44–45.

The WAP accorded several procedures for the distribution of account balances to participants, as follows:

> 5.1    Distributions. Except as otherwise described below, upon electing to participate in the Plan for a Plan Year, a Participant will also make an election with respect to the timing of the payment of the amounts credited to such Participant's account for such Plan Year.
>
> 5.2    Distribution Dates for Special Participants.[7] Notwithstanding anything to the contrary in Section 5.1 or 5.3, but subject to Section 5.4, all Deferred Compensation and Company Contributions contributed to this Plan during a period when a Participant is a Special Participant will be distributed in full promptly after, but in no event after the 90th day following, the July 1 of the sixth Plan Year following the Plan Year for which the contribution is made. The Participant's account will be valued as of the Valuation Date on or immediately preceding the distribution date.
>
> 5.3    Distribution Dates for Other Participants.
>
> > (a)    Distribution Pursuant to the In-Service Payment Date.[8] If the Participant selected an In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Committee may impose, distributions will be made in a single payment in the specified year promptly after, but in no event

---

[7]"Special Participant" meant a participant who was classified by his or her employer as a financial consultant in the private client group and whose production was less than $350,000 per year (or such higher threshold as may be established by the Committee) during the fiscal year ended prior to the plan year for which deferred compensation was credited. (Docket Entry No. 24, Exhibit A, p. 39.)

[8]"In-Service Payment Date" meant a distribution date, as elected by the employee on his or her election Form, that occurred while the participant was an employee of the company or of an employer affiliate. (Docket Entry No. 24, Exhibit A, p. 38.)

after the 90th day following, July 1 of such year. With the consent of the Committee, a Participant may change the In-Service Payment Date pursuant to the procedures established by the Committee and the restrictions under Code Section 409A, which generally require making a written request more than 12 months in advance of the In-Service Payment Date and selecting a new In-Service Payment Date that will occur at least five years after the originally selected date.

(b)     Distribution on Separation[9] or Retirement.[10]

   (i)     If (A) the Participant elected payment on Separation on his or her Election Form[11] or (B) if such Separation occurs prior to the otherwise scheduled In-Service Payment Date, then subject to this SECTION 5 and any other terms and conditions the Committee may impose, the Participant's Account Balance will be distributed due to Separation[.]

   (ii)    If distribution is made due to Separation, distribution will be made in either a lump sum payment or in installments, as selected by the Participant on his or her Election Form. Available forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal installments for up to ten years.

---

[9]"Separation" meant the separation of employment from the employers or any employer affiliate, as the case may be, of a participant other than due to such participant's death, disability, or termination for cause. *Id.*, p. 39.

[10] "Retirement" meant the separation of a participant whose age and years of employment (as determined using the service rules set forth in RBC's separate Retirement and Savings Plan) with the employers when combined equaled 60. *Id.*

[11]"Election Form" meant the eligible employee's written election setting forth (a) the percentage of an employee's gross cash compensation he or she elected to defer, (b) the distribution date for his or her deferred compensation and company contributions, and (c) such other information as determined by the Committee. *Id.*, pp. 37–38.

\* \* \* \*

    (iv)    If the Participant did not indicate a distribution date on his or her Election Form, or if the Election Form was not timely filed, then distribution of the Account Balance will be made promptly after, but in no event after the 90th day following, the July 1 immediately after the date of vesting.

\* \* \* \*

    (c)    Distribution Following Death or Disability. Distributions following death will follow the procedures set forth in Section 5.6. Distributions following Disability will be made in a single payment to the Participant promptly after, but in no event after the 90th day following, the date the Participant satisfies the definition of Disability.

(Docket Entry No. 24, Exhibit A, pp. 45–47.) In the event a participant's employer was no longer a participating subsidiary under the WAP due to corporate control changes, vested account balances were to be distributed to the affected employee participants on the date of such change or within 90 days thereafter. *Id.*, p. 47.

The WAP must be examined with reference to these provisions to determine whether by its express terms, or as a result of surrounding circumstances, it provided retirement income to employees or resulted in a deferral of income by employees extending to or beyond termination of employment. Additionally, the provisions and surrounding circumstances must be examined to determine whether the WAP provided retirement income to employees or resulted in a deferral of income by employees extending to or beyond termination of employment.

11

The Court will undertake first an examination of the WAP's express terms, then consider the surrounding circumstances, in order to determine whether the WAP stands as an employee pension benefit plan for purposes of this lawsuit.

Express Terms

The Fifth Circuit Court of Appeals has advised that section 1002(2)(A)'s phrase, "provides retirement income,"

> [is] not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach. Any outright conveyance of property to an employee might result in some payment to him after retirement. The words 'provides retirement income' patently refer only to *plans designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances.

*Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) (emphasis added); *see also Boos v. AT&T Inc.*, 643 F.3d 127, 134 (5th Cir. 2011). Thus, the proponents of an ERISA plan must prove that the plan was "designed for the purpose of paying retirement income whether as a result of [its] express terms or surrounding circumstances." *Murphy*, 611 F.2d at 575. The Fifth Circuit concluded that the subject benefit in *Murphy* was not a pension plan because "the primary thrust of the plan [was] to reward employees during their active years." *Id*. The Fifth Circuit noted that the section 1002(2)(A) definition of an employment pension benefit plan "is not algorithmic." *Id*.

The stated purpose of the WAP was to allow select employees to defer portions of their anticipated compensation, and to provide them an opportunity to invest compensation in tax-deferred savings and investments in an effort to support long-term savings and share

in RBC's growth and profitability. Neither retirement nor termination/post-termination income was an expressly stated purpose or goal of the plan. Although Plaintiffs argue that the stated purpose of "support[ing] long-term savings" is equivalent to "provid[ing] retirement income to employees" (Docket Entry No. 93, p. 18), they proffer no supporting authority holding that these are interchangeable goals and purposes, and this Court has found none.

Close inspection of the WAP provisions themselves reveals no express terms for providing retirement or termination/post-termination income to employees. Section 2.2 of the WAP, concerning "Election to Voluntarily Defer Compensation," states that, "Eligible Employees may enroll in the Plan by electing to make Voluntary Deferred Compensation contributions for the next succeeding Plan Year." (Docket Entry No. 24, Exhibit A, p. 40.) Under section 2.3, employers were to reduce each participant's gross payroll compensation by any mandatory deferred compensation and contribute it to the plan on each such employee's behalf.

Under section 2.6, concerning "Company Contributions," the Committee was to establish whether, and the extent to which, a participant was eligible for company contributions, in the form of matching contributions and discretionary contributions, on an annual basis or as otherwise determined by the Committee. Reference was made to "retirement" in section 2.6(a)(iii), but only as to a right to diversify matching contributions and RBC common shares upon the participant's separation from the company. The provision

explicitly noted that "retirement" for purposes of diversification was not necessarily a "Retirement" as defined under the WAP.

Section 3 of the WAP, "Information Concerning Investment Alternatives," discussed procedures for a participant's election to have a portion of his or her deferred compensation credited toward RBC common shares and the purchase of additional common shares, and for the receipt of dividends declared on the company's common shares. Provisions were also made for participants' electing to invest all or portions of their deferred compensation in mutual funds.

Section 4 of the WAP, entitled "Vesting," provided that all voluntary deferred compensation in a participant's account would be fully vested at all times. Mandatory deferred compensation and company contributions were to vest as determined by the Committee in its sole discretion, but would immediately vest upon the participant's death or disability during employment. These latter contributions would also vest upon the participant's agreed separation from the company (as opposed to an employee who were to quit or otherwise terminate employment without an agreement), or if at the time of separation, the employee met the requirements of Retirement[12] and entered into an agreed non-competition contract. Any company contributions and mandatory deferred compensation not vested as of an employee's separation date would be deemed forfeited.

_____

[12]*See* footnote 8, *supra.*

14

Section 5, regarding "Distributions," provided that an employee, upon electing to participate in the WAP, was to make an election with respect to the timing of the payment of the amounts credited to his or her account for the plan year. All deferred compensation and company contributions for special participants[13] would be distributed in full promptly after July 1 of the sixth plan year following the plan year for which the contribution was made. For other participants, distributions would be made as a single payment according to the employee's selected in-service payment date.[14] If the selected distribution date was the date of separation, or if separation occurred prior to a selected in-service payment date, the distribution was to be made as either a lump sum or in installments, as elected by the participant. If the employee met the requirements for "Retirement" at the time of separation, as defined by the WAP, he or she could elect in writing to receive the account balance in annual installments for up to ten years. In the event the participant did not indicate, or timely indicate, a distribution date on his or her election form, then distribution would be made immediately after the date of vesting. In the event of a defined change in corporate control, distributions would be made upon finalization of the change in control.

Accordingly, the WAP contained no express terms for providing retirement income to participants or for the deferral of income until termination/post-termination. To the contrary, an eligible participant such as Tolbert would need to expressly elect in writing to

---

[13]*See* footnote 7, *supra*. Tolbert does not allege that she was a Special Participant, and these provisions have no application here.

[14]*See* footnote 6, *supra*.

have his or her account balance distributed at or following termination. If an eligible participant's account balance was received on a termination/post-termination basis, it was an anticipated consequence of the participant's written election and not due to the goal, design, or express terms of the plan.[15] In short, the WAP did not require participants to defer compensation until termination/post-termination, and there is only a possibility that the plan would result in the deferral of income to termination and beyond as to participants or any particular participant.

The Fifth Circuit Court of Appeals has not determined whether a participant's written election to defer compensation (to termination/post-termination or otherwise), or the existence of the option itself, establishes an employee pension benefit plan under section 1002(2)(A) triggering ERISA coverage. In *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999), such circumstances were held to negate ERISA coverage, as any deferral of compensation until retirement was "strictly at the option of the participant." The *Emmenegger* court noted with approval Department of Labor ("DOL") Advisory Opinion No. 84-12A (Feb. 23, 1984), which stated as follows:

> [B]ecause the Plan does not condition distribution of the amount deferred [into phantom stock shares] upon termination of employment, retirement, or any other circumstances other than the passage of a fixed period of time, the Plan is not by its express terms an employee pension benefit plan within the meaning of . . . ERISA.

---

[15]If a participant quit or otherwise left the company without an agreed separation, the receipt of any funds post-termination would be a consequence of the employee's termination as a participant in the plan.

*Emmenegger*, 197 F.3d at 933.[16]

Moreover, the WAP does not condition the receipt of vested benefits on a participant's retirement or termination. To the contrary, some participants were required to receive WAP benefits while they were still employed by the company; others automatically received WAP benefits while still employed unless they expressly and timely elected otherwise. In particular, during plan years 2007–2009, the WAP mandated that all company contributions for certain employees be distributed immediately upon vesting, and that the funds could not be deferred to retirement or termination. (Docket Entry No. 91, p. 15.) The remaining employees were given the option, on an annual basis, to either receive their funds on an in-service basis while employed, or to wait to receive them after they left the company. If the employee did not exercise his or her annual election, the WAP required that the employee's company contributions for that year be distributed on an in-service basis. *Id.*, p. 16.

Nor is this Court persuaded by Plaintiffs' argument that the WAP could be, and was, used by participants to accrue funds for retirement, if they so elected. Relying on the Fifth Circuit's decision in *Murphy*, the Third Circuit Court of Appeals in *Houston v. Aramark Corp.*, 112 F. App'x 132, at *3 (3rd Cir. 2004), held that, "The design of the plan at issue,

---

[16]The DOL Advisory Opinion is one of three that outline essentially the same general rule: a plan that does not condition distribution of funds based upon retirement or termination of employment but is triggered solely by the passage of time is not an ERISA pension benefit plan; however, such a plan could constitute an ERISA pension plan as a result of surrounding circumstances, *i.e.* if the operation or administration of the plan resulted in the provision of retirement income or deferred income past the termination of covered employment. *See* Department of Labor Advisory Opinions No. 98-02A (March 6, 1998), No. 84-12A (February 23, 1984), and No. 81-74A (September 29, 1981).

not the individual participants' intended use of the proceeds, must be the perspective from which the definition of 'employee pension benefit plan' is determined." Here, the WAP was designed to allow employees to defer compensation; their reasons for doing so, and whether they received their account balances during employment or after, were largely a matter for each participant's own determination.

A review of the relevant plan provisions fails to reveal that the WAP, by its express terms, resulted in a deferral of income by employees for periods extending to termination of employment or beyond. To the contrary, such an event would occur only if timely elected by a participant in writing, such that the event occurred by reason of the participant's choosing, not by reason of plan's express terms. As already determined by the Court, the express terms of the WAP do not provide retirement income. In short, the express terms of the WAP do not establish the WAP as an employee pension benefit plan under section 1002(2)(A).

Attention must now be turned to whether "surrounding circumstances" establish the WAP as an ERISA plan under section 1002(2)(A).

Surrounding Circumstances

Absent applicable express terms, the WAP may still meet the requirements for an employee pension benefit plan if, as a result of surrounding circumstances, the plan either provided retirement income to employees or resulted in a deferral of income by employees for periods extending to, or beyond, termination of employment. 29 U.S.C. § 1002(2)(A).

18

Before embarking on this analysis, however, the Court must address Defendants'

argument that, under 29 C.F.R. 2510.3-2(c), "systematic operations" or "systematic deferral

until termination or beyond" are relevant factors for determining the WAP's "surrounding

circumstances." (Docket Entry No. 95, p. 9.) In 29 C.F.R. § 2510.3-2, the Secretary of

Labor clarified the limits of the terms "employee pension benefit plan" and "pension plan"

by identifying certain plans which would not constitute employee pension benefit plans. 29

C.F.R. § 2510.3-2(a). Specifically, subsection (c) of the regulation provides that:

> Bonus program. For purposes of title I of the Act and this chapter, the terms
> 'employee pension benefit plan' and 'pension plan' shall not include payments
> made by an employer to some or all of its employees as bonuses for work
> performed, unless such payments are *systematically deferred* to the termination
> of covered employment or beyond, or so as to provide retirement income to
> employees.

29 C.F.R. § 2510.3-2(c) (emphasis added). Defendants posit that the WAP is not an ERISA

pension plan because it does not systematically defer compensation until termination/post-

termination. Although Defendants have not cast the WAP as a bonus program in this lawsuit,

they urge the Court to extend the "systematically deferred" provision of 29 C.F.R. § 2510.3-

2(c) to the present analysis because the purpose of 29 C.F.R. § 2510.3-2(a) is to identify

certain plans that do not meet the definition of an ERISA plan. (Docket Entry No. 95, p. 9.)

In short, Defendants would interpret the regulation as holding that a deferred compensation

plan is not an employee pension benefit plan unless it *systematically defers* compensation

until time of termination or beyond.

The Court declines to adopt Defendants' interpretation. The regulation clearly states that *employee bonus payments* do not constitute a pension plan unless the payments are systematically deferred until termination or beyond, or so as to provide retirement income. Defendants do not direct this Court to any governing authority that has extended the "systematically deferred" language to non-bonus deferred compensation programs or plans. In particular, Defendants cite no authority holding that a non-bonus deferred compensation plan was not covered by ERISA because it did not systematically defer compensation to or beyond termination of employment. Accordingly, the Court will not look to whether the WAP "systematically deferred" compensation in determining whether the plan was an employee pension benefit plan.

Plaintiffs assert that surrounding circumstances show that the WAP, in operation, deferred compensation until retirement or termination, in that participants could elect to defer compensation for distribution following termination of employment, and that account balances were at times distributed upon termination of employment. Defendants, to the contrary, argue that the WAP did not, in operation, defer compensation until retirement or termination, in that participants could elect to receive their balances upon vesting and were not required to wait until retirement or termination of employment. Factually, both parties are correct; in operation, the WAP allowed participants to make written elections for either of these two possible outcomes.

The Fifth Circuit Court of Appeals has not expressly determined whether a plan participant's option – or election – to defer distribution until termination/post-termination of employment (as in the instant case) may constitute "surrounding circumstances" for purposes of section 1002(2)(A). This Court finds persuasive the Eighth Circuit Court of Appeals' opinion in *Emmenegger*, finding that the existence of such an option precluded ERISA coverage. 197 F. 3d at 933. Although the WAP allowed participants to delay distribution of their account balances until termination, such result was not a stated purpose or intent of the WAP. That under certain conditions it may have such result, the result was a consequence of a participant's own written election, not the operation or administration of the WAP.

Plaintiffs also rely on various email and annual communications regarding the WAP as establishing the requisite surrounding circumstances. One such email, dated September 23, 2006, was sent by the RBC US Retirement Benefits Department to two RBC Wealth Management officials, and referenced future changes in WAP eligibility. Plaintiffs note that the email commences with an acknowledgment of the WAP as an ERISA top hat plan: "As a 'top hat' plan, the [WAP] is a nonqualified retirement plan limited to a select group of employees and is exempt from some ERISA regulations." (Docket Entry No. 24, Exhibit B.) The email continued with an explanation for the eligibility changes: "In order to maintain this status and ensure that the WAP is available only to a select group on an ongoing basis, modifications to participant eligibility are required for 2009." *Id.* This email, however, is consistent with the WAP's own language and DOL registration letter, which essentially

stated that WAP was not intended to be an employee pension benefit plan under ERISA but, should it be held as such, that it was intended to qualify as a top hat plan. To that end, it was necessary for the WAP to maintain compliance with top hat requirements, as spelled out in the email. This can also be seen in the WAP Enrollment and Changes to WAP Eligibility email dated November 19, 2008, sent to "RBCWM–Complex Directors," reiterating that the WAP "is intended to be a 'top hat' plan, meaning that it is a nonqualified retirement plan limited to a select group of employees and is exempt from some ERISA regulations." (Docket Entry No. 84, Exhibit 8, p. 1.) The email advised that, "The WAP underwent a thorough legal review in 2008. As a result of the review, in order to maintain the 'top hat' status and comply with IRS guidelines so that it remains a valuable plan with favorable tax benefits, modifications to participant eligibility are required for 2010." *Id.*

Included with this email of November 19, 2008, was a question and answer ("Q&A") addendum addressing hypothetical questions regarding the future plan changes. The addendum reminded management to "encourage" financial consultants to "surpass" their compensation production threshold for "achieving the significant financial benefits." *Id.*, p. 2. Once a certain eligibility threshold was reached, the financial consultants could defer up to 50% of WAP eligible compensation. *Id.* A lower eligibility threshold merited a deferred productivity bonus. No mention was made of retirement or post-termination benefits. Under the "Distributions" portion of the Q&A, readers were informed that there were two

distribution options under the WAP: a "Retirement Distribution" and an "In-Service Distribution." As to the former, readers were told that,

> You do not need to officially 'retire' from RBC to receive the retirement distribution installments. If you leave the firm for any reason, you will receive your distribution in the number of installments you elected, so long as you satisfy the Rule of 60.[17] Please note that your distributions do not start until after you leave the firm.

*Id.*, p. 4. The installment distribution was available to a participant only if he or she affirmatively chose that form of distribution and met the Rule of 60. The In-Service Distribution election could be chosen by any participant who was employed on the in-service date; the participant was required to defer an in-service distribution for a minimum of five years. *Id.* Neither the plan nor the Committee's publications required or encouraged one distribution election over the other. These emails, publications, and Committee provisions do not stand as surrounding circumstances demonstrating that the WAP, in operation or administration, deferred compensation until retirement or employment termination/post-termination.

Plaintiffs further argue that courts and DOL rulings have repeatedly determined that plans can still constitute ERISA pension plans even if participants had an option to make withdrawals before retirement or termination. Plaintiffs' argument misses the mark. The plans in these other cases and rulings were ERISA plans in the first instance; the only question was whether a right of early withdrawal terminated the ERISA status. In *In re*

_____

[17]The addendum defined the Rule of 60 as "age plus years of service with RBC is equal to or greater than 60." (Docket Entry No. 84, Exhibit 8, p. 4.)

*Meinen*, 228 B.R. 368, 381 (Bankr. W.D. Pa. 1998), the court observed that the express purpose of the subject employee plan was to "provid[e] funds for old age security," and found that the plan was covered by ERISA. The court then held that an employee's ability to withdraw portions of the funds prior to retirement or termination of employment did not negate the plan's status as an employee pension benefit plan. Thus, contrary to Plaintiff's argument, the court did not look to the right of early withdrawal as a factor in determining, *ab initio*, whether the plan was an employee pension benefit plan. Likewise, in *Spitz v. Berlin Indus., Inc.*, 1994 WL 48593 (N.D. Ill. 1994), the employer designed and registered the employee plan explicitly as a top hat plan; the employee argued that it was a bonus plan exempt from ERISA coverage. The court noted that the plan called for systematic deferral of payments so as to provide retirement income to employees, which meant that the plan was not an ERISA-exempt bonus plan under 29 C.F.R. § 2510.3-2(c). The district court held that the fact that some funds in an employee's account were accessible on an early basis did not destroy the systematic deferral of payments. This case, too, provides Plaintiffs no direct benefit. Moreover, the three DOL Advisory Opinion Letters cited by Plaintiffs are without relevance, as a provision for early withdrawal of funds from an existing ERISA plan is not an issue in the instant case.

The parties agree that certain WAP participants were subject to a four-year or five-year "cliff" vesting schedule for company contributions. Plaintiffs contend that this vesting schedule is a surrounding circumstance that resulted in deferral of income by employees for

24

periods extending to the termination of covered employment or beyond. (Docket Entry No. 93, p. 40.) In support, Plaintiffs rely on a 1979 DOL advisory opinion regarding an employee plan that did not permit withdrawals until the earlier of eight years after the contribution was made or upon termination. The DOL concluded that the plan was an employee pension benefit plan because it "result[ed] in deferrals on income for periods extending to termination of covered employment." *See* Dept't of Labor Adv. Op. No. 79-33A (May 22, 1979). (Docket Entry No. 93, Exhibit 29E.) Plaintiffs extrapolate from this advisory conclusion that the WAP's vesting cliffs likewise result in an employee pension benefit plan. The Court is not persuaded. In addition to the eight-year cliff, the plan in the advisory opinion expressly prohibited withdrawals until termination of employment. For this reason, it cannot be said that the eight-year cliff was relevant to the advisor's conclusion regarding ERISA coverage, nor does it appear from a reading of the short advisory opinion that it constituted a relevant "surrounding circumstance."

In addition to the above general arguments, Plaintiffs contend that the following specific factors constitute "surrounding circumstances" establishing the WAP as an ERISA plan as a matter of law.

A.    RBC represented and promoted the WAP as a retirement plan

Plaintiffs contend that RBC marketed the WAP as a retirement plan in the following particulars: sending out emails referring to the plan as a retirement plan; stating in brochures and memoranda that the WAP was "integral to our Finishing Well Strategy" and that it

"works hand-in-hand" with RBC's 401k plan; describing the WAP as part of the "menu of retirement savings" providing employees with "opportunities to finish well at RBC by building long-term wealth . . . over the course of your career," and "emphasizing" the "retirement distribution" option. (Docket Entry No. 93, pp. 33–34.) In support, Plaintiffs rely on *Freund v. Marshall & Ilsley Bank*, 485 F. Supp. 629, 634 (D.C. Wisc. 1979), which held that, as a result of surrounding circumstances, the subject plan operated to provide retirement income to employees where the company encouraged, if not required, employees to leave their funds in the plan for retirement, and both plan officials and participants believed that retirement benefits were being provided by the plan. This can also be seen in DOL Advisory Opinion Letter No. 90-17A (Oct. 25, 1990), 1990 WL 263441. In the letter, the DOL advised the recipient that the express terms of the subject employee stock purchase plan "did not appear to provide retirement income or result in a deferral of income to termination of employment or beyond." However, the DOL further advised that:

> You should be aware that the Plan can be viewed by the Department as a pension plan as a result of surrounding circumstances. Based on the facts provided, the Plan might be regarded as a pension plan as a result of surrounding circumstances if it is administered in a manner that has the effect of providing retirement income to employees, if it results in a deferral of income by employees extending to termination of covered employment or beyond, or of communications to Plan participants suggest that the Plan is established or maintained for the purpose of providing retirement income or to defer income to the termination of covered employment or beyond. *For example, if an employer or any person acting directly or indirectly in the interest of an employer prevents or discourages participants' requesting or receiving a distribution of their property or reselling stock acquired under the arrangement, the Department may view the arrangement as a pension plan within the meaning of section 3(2)(A) of ERISA.*

26

*Id.*, p. 2 (emphasis added).

In none of the communications referenced by Plaintiffs did RBC encourage, much less require, participants to defer receipt of their WAP benefits until retirement or termination, or discourage participants from taking their benefits on an in-service basis. What is clear from the communications submitted by Plaintiffs is that RBC encouraged employees and participants to meet production thresholds in order to earn greater financial rewards and amass greater wealth while employed at RBC. (Docket Entry No. 91, p. 32.)

WAP participants were free to use their account balances in whatever manner they deemed fit, as shown in the next argument.

> B.    WAP participants regularly used the WAP as a retirement plan

Plaintiffs and Defendants direct the Court to statistics showing that certain percentages of WAP participants elected annually to receive in-service distributions while employed, and that certain percentages elected annually to defer distributions until termination of employment. Defendants argue that "the majority" of WAP participants received in-service distributions of their WAP benefits (Docket Entry No. 92, p. 12, Exhibit 3), while Plaintiffs, relying on substantially the same statistics, argue that "nearly half" of the participants elected to defer receipt of account balances until after termination (Docket Entry No. 93, p. 12). As can happen with statistical evidence, both sides rely on the same data as proof positive of their respective positions. Indeed, the data support both positions: WAP participants regularly used the WAP for retirement purposes and, conversely, WAP

participants regularly used the WAP during employment for purposes unrelated to retirement. Moreover, "nearly half" is, without doubt, less than "the majority" of a given population.

Plaintiffs themselves evince the statistical profile. For each year in which she participated in the WAP, Tolbert elected to receive her account balance upon termination of her employment. (Docket Entry No. 93, p. 34; Plaintiff's Supplemental Exhibit 28.) Neuhaus and Gift, on the other hand, each elected to receive their benefits on an "in-service" basis during their employment for reasons unrelated to retirement planning. (Docket Entry No. 111, p. 4; Exhibits A, B.) Neuhaus testified in his deposition that he took in-service distributions because he had two daughters in college. *Id.* Similarly, Gift testified in his deposition that he took in-service distributions because, "I had a child in college, which I still do, so a lot of times that's helpful." *Id.*

Regardless, Plaintiffs' reliance on this statistical approach affords them no benefit. Citing with approval the Fifth Circuit's reasoning in *Murphy*, the Third Circuit Court of Appeals held that:

> The question is one of perspective. Houston essentially argues that because he intended to fund his retirement with the stock proceeds, and because the plans resulted in a deferral of a portion of his income to his retirement date and beyond, the plans meet ERISA's definition of 'employee pension benefit plan.' This interpretation cannot stand. . . . *The design of the plan at issue, not the individual participants' intended use of the proceeds, must be the perspective from which the definition of 'employee pension benefit plan' is determined.*

*Houston v. Aramark Corporation*, 112 F. App'x 132, 136 (3rd Cir. 2004) (emphasis added).

Here, the WAP's flexible design allowed participants to use their account balances as they saw fit, to meet their own individual needs. That some participants elected to exercise their option to receive their funds on a termination/post-termination basis does not establish that, as a result of surrounding circumstances, the WAP provided retirement income to employees or resulted in a deferral of income by employees for periods extending to, or beyond, termination of employment for purposes of 29 U.S.C. § 1002(2)(A).

C.     The WAP provided heightened tax benefits as a retirement plan

Plaintiffs contend that courts use tax consequences as a relevant surrounding circumstance in evaluating whether a plan constitutes an ERISA pension plan. (Docket Entry No. 93, p. 35.) In support, they cite *In re Meinen*, 228 B.R. 368, 381 (Bankr. W.D. Pa. 1998), wherein the court observed that "employees, by virtue of federal income tax penalties for such early withdrawals . . . are generally biased towards deferring receipt of said compensation until they either separate or retire from employment." Plaintiffs quote the court's words out of context. Prior to making the above statement, the court noted that the plan expressly declared as its primary purpose the encouraging and assisting of employees "in providing funds for old age security," and that the plan expressly provided for the deferral of income until a participating employee's severance of employment by reason of, *inter alia*, retirement. *Id*. The court then concluded that, "On the basis of these express terms, the [Plan] is an employee pension benefit plan." *Id*. The court then stated that a right of early withdrawal did not destroy ERISA coverage, because employees would likely avoid making

early withdrawals because of the resulting tax penalties. Contrary to Plaintiff's argument, the tax consequences of the subject plan was not a "surrounding circumstance" relevant to the court's determination that the plan was an employee pension plan.

Plaintiffs' reliance on *Holansky v. Prudential Financial*, 2004 WL 1404016 (N.D. Ill. 2004), is likewise misplaced. Indeed, in denying the defendants' motion to dismiss the subject ERISA claims, the court stated that, "[W]e make no findings as to what facts may or may not meet [plaintiff's] burden of proof" as to "surrounding circumstances" establishing the plan as governed by ERISA. *Id.*, at *2. Accordingly, *Holansky* does not support Plaintiff's argument that "surrounding circumstances" includes the tax consequences of a plan, as the issue was not reached.

### D. RBC registered the WAP with the DOL as a top hat plan

As proof that Defendants themselves recognized the WAP as an ERISA pension plan, Plaintiffs point to the registration statement letter submitted by Dain Rauscher Investment Services to the Department of Labor – Pension and Welfare Benefits Administration, dated March 13, 2001. The statement, "filed pursuant to DOL Reg. Section 2520.104-23," notified the DOL that, "should [the WAP] be considered a pension plan under ERISA," Dain Rauscher "maintains and administers the Plan primarily for the purpose of providing deferred compensation to a select group of its management and highly-compensated employees." (Docket Entry No. 84, Exhibit 10.) Plaintiffs' reliance on this statement is misplaced, as the statement evinces nothing more than Defendants' well-documented position that the WAP

was not an ERISA pension plan, but that if it were at some point found to be an ERISA pension plan, that it was an ERISA-exempt top hat plan.

The WAP does not expressly, or by surrounding circumstances, condition a participant's receipt of an account balance upon termination or retirement. Any retirement advantage is only incidental to the stated purpose and design of the WAP, and is controlled by a participant's written election to defer compensation until such time as retirement advantages are possible. That some participants may receive their account balances at or after termination, or even use the proceeds for retirement purposes, is a function of their individual election, not of the WAP's express terms, operation, administration or surrounding circumstances. For these reasons, the Court finds that, as a matter of law, the WAP is not an employee pension benefit plan under section 1002(2)(A) and is not subject to ERISA

## IV. CONCLUSION

Defendants' Motion for Summary Judgment (Docket Entry No. 91) is **GRANTED**, and this lawsuit is **DISMISSED WITH PREJUDICE**. All other pending motions are **DENIED AS MOOT**. Costs shall be borne by the party incurring same.

Signed at Houston, Texas, on this the _____ day of March, 2013.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE