# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 14, 2014

Lyle W. Cayce
Clerk

No. 13-20213

BRENDA TOLBERT; JOSEPH RICE NEUHAUS, JR.; and LAWRENCE GIFT, JR.,

          Plaintiffs–Appellants,

v.

RBC CAPITAL MARKETS CORPORATION, now known as RBC Capital Markets, L.L.C.; RBC CENTURA BANK, now known as RBC Bank, (USA); RBC U.S. INSURANCE SERVICES, INCORPORATED,

          Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas

Before DAVIS, BARKSDALE, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

    The plaintiffs in this case are former employees of the defendant ("RBC") who participated in a wealth accumulation plan ("WAP") during their periods of employment. Giving rise to this lawsuit, portions of the plaintiffs' WAP accounts were forfeited when the plaintiffs left their jobs at RBC. The plaintiffs allege that the forfeitures amounted to violations of the Employment Retirement Income Security Act ("ERISA"). The district court granted RBC's motion for summary judgment, concluding that the WAP is not subject to ERISA because it is not an "employee pension benefit plan." We conclude that

Exhibit A

the WAP is an "employee pension benefit plan" and therefore REVERSE and REMAND.

## I.
### A.

An ambitious statutory scheme, ERISA is designed "to protect . . . the interests of participants in employee benefit plans and their beneficiaries" by (1) "requiring the disclosure and reporting to participants and beneficiaries"; (2) "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans"; and (3) "providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). The primary enforcement mechanism is located in 29 U.S.C. § 1132, which is titled "Civil enforcement." *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) ("This integrated enforcement mechanism, [§ 1132(a)], is a distinctive feature of ERISA, and essential to accomplish Congress' purpose of creating a comprehensive statute for the regulation of employee benefit plans."). Section 1132(a) creates, among other things, a private cause of action against a fiduciary who breaches his fiduciary duties vis-à-vis an employee benefit plan. *See Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (declining to determine whether defendant satisfied "ERISA's strict fiduciary duties" because defendant "was not a fiduciary as defined by ERISA").

Here, ERISA coverage turns not on whether the defendant is a fiduciary but on whether the WAP is an "employee pension benefit plan" (or "pension plan") under 29 U.S.C. § 1002(2)(A). A "pension plan" is

> any plan, fund, or program . . . maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program
>
> > (i) provides retirement income to employees, or

No. 13-20213

> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. . . .

§ 1002(2)(A)(i)–(ii). Thus, if the WAP is a "pension plan," ERISA applies, and the plaintiffs may proceed with their lawsuit. If the WAP is not a "pension plan," ERISA does not apply, and the plaintiffs have no ERISA remedy.

B.

It is within this framework that we view the WAP. The "General Nature and Purpose" of the WAP is announced at the beginning of the document:

> [The WAP] is a nonqualified, deferred compensation plan pursuant to which a select group of management or highly compensated employees of [RBC] may be offered the opportunity to elect to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year. The [WAP] is designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings and allow such employees to share in [RBC's] growth and profitability, if any.

A "Committee" of RBC executives administers the WAP. The amounts funneled into the participating employees' WAP accounts fall into three categories: (1) Voluntary Deferred Compensation; (2) Mandatory Deferred Compensation; and (3) Company Contributions.

Voluntary Deferred Compensation (i.e., the percentage of a participating employee's compensation that the employee elects to defer) is always fully vested. Mandatory Deferred Compensation (i.e., the percentage of an employee's compensation that the Committee designates as a required deferral) and Company Contributions (i.e., contributions made by RBC, including matching contributions and discretionary contributions) vest later, on dates determined by the Committee. Notwithstanding the Committee's

No. 13-20213

vesting dates, Mandatory Deferred Compensation and Company Contributions vest immediately upon either the death of the employee or the separation of the employee. In order for the amounts to vest at the time of an employee's separation, certain criteria must be met; if the criteria are not met, then the employee forfeits the unvested amounts.[1]

A participating employee is required to elect a distribution date. Generally, a participating employee may elect to have her account distributed either "In-Service" (i.e., during her employment) or upon separation from employment. For the latter choice, "[a]vailable forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years." If an employee fails to elect a distribution option, distribution occurs by default promptly upon the vesting date. Distribution also occurs promptly upon death or disability. If an employee is terminated "for Cause" prior to the distribution of her account balance, all Mandatory Deferred Compensation and Company Contributions are forfeited.

Under the heading "ERISA Matters," the WAP speaks to the term at issue here—"employee pension benefit plan":

> Although the [WAP] is not intended to be a tax-qualified plan under [26 U.S.C. §] 401, the [WAP] might be determined to be an "employee pension benefit plan" as defined by ERISA. If the [WAP] is determined to be an "employee pension benefit plan," [RBC] believes that it constitutes an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements. A statement has been filed with the

---

[1] Vesting where the employee has separated from employment is dependent on the employee either (1) entering into a "business transition agreement" or (2) satisfying the requirements "under the Plan for Retirement" and entering into a non-competition agreement. These provisions are not central to the dispute.

4

No. 13-20213

Department of Labor to comply with ERISA reporting and disclosure requirements.

### C.

Each plaintiff in this case participated in the WAP as an RBC employee. Brenda Tolbert worked as an administrative assistant at RBC and participated in the WAP until 2009, when she was terminated for cause.[2] Joseph Rice Neuhaus, Jr., and Lawrence Gift, Jr., were financial consultants at RBC. Neuhaus and Gift participated in the WAP until they voluntarily resigned in 2011, without satisfying the separation criteria. Under the terms of the WAP, the amounts in the plaintiffs' accounts that had not yet vested (in the case of Neuhaus and Gift) or had not yet been distributed (in the case of Tolbert) were forfeited.

The plaintiffs do not quibble over whether the forfeitures complied with the terms of the WAP. Instead, the plaintiffs allege in this lawsuit that the forfeiture provisions violate ERISA's mandates.[3] The plaintiffs assert a claim for breach of fiduciary duty under § 1132(a)(2) and a claim for equitable relief under § 1132(a)(3). RBC filed a motion for summary judgment on the grounds that the WAP does not constitute an "employee pension benefit plan" and, in the alternative, that the WAP is an exempt "top hat" plan. The district court granted the motion on the first ground, without deciding whether the WAP constitutes a "top hat" plan.

### II.

We review a grant of summary judgment *de novo*. *Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 290 (5th Cir. 2013). Generally, whether ERISA covers a given plan is a mixed question of fact and law, but where the

---

[2] The facts underlying Tolbert's termination are not at issue here.

[3] Tolbert filed the lawsuit; Neuhaus and Gift joined the lawsuit later.

5

underlying factual circumstances are undisputed, we have treated the question as one of law to be reviewed *de novo*. *Id.*

A.

As indicated above in Part I.A, the question before us is a discrete one: whether, "by its express terms or as a result of surrounding circumstances," the WAP (i) "provides retirement income to employees" or (ii) "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." *See* § 1002(2)(A)(i)–(ii).

The parties offer competing views of the statutory text. The plaintiffs argue—through the lens of case law indicating that ERISA must be "liberally construed"—that "all Congress requires of an ERISA pension is that it provide employees an ability, by the plan's express terms or surrounding circumstances, to defer current compensation until retirement or until separation or beyond." RBC argues in response that the WAP is not a "pension plan" because "the primary purpose of the WAP is *not* to provide retirement or deferred post-termination income, but rather, to attract and retain key employees by awarding bonuses and other . . . incentives." RBC thus takes a narrow view of the statute.

To resolve the dispute, we begin by noting that the definition of "pension plan" in § 1002(2)(A) is neither "algorithmic" nor meant "to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980). Turning to subsection (i) specifically, we first addressed the phrase "provides retirement income" in 1980: "The words 'provides retirement income' patently refer only to plans *designed for the purpose of paying retirement income* whether as a result of their express terms or surrounding circumstances." *Id.* (emphasis added). We reiterated that interpretation in 2011. *Boos v. AT&T, Inc.*, 643 F.3d 127, 134 (5th Cir. 2011). We also reinforced the notion that a plan is not

No. 13-20213

a "pension plan" under subsection (i) if "'the primary thrust of the plan is to reward employees during their active years.'" *Id.* at 133 (quoting *Murphy*, 611 F.2d at 574).

With this interpretation in mind, we agree with the district court and RBC insofar as subsection (i) is concerned. The record reflects that the WAP was not designed to provide retirement income, considering, for example: the WAP's statement of purpose (announcing the goal of allowing "employees to share in [RBC's] growth and profitability") and the *de facto* distribution date (immediately upon vesting). The plaintiffs have not demonstrated otherwise. Accordingly, we conclude that the WAP does not "provide[] retirement income" within the meaning of subsection (i).

If the WAP is to be considered a "pension plan," then, it must fall within subsection (ii). On appeal, RBC conflates subsections (i) and (ii). RBC argues that the "critical inquiry" in this case turns on the above-quoted *Murphy* and *Boos* language ("designed for the purpose of paying retirement income"), without distinguishing between the two subsections. We reject that approach. The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i). Under subsection (ii), the critical inquiry is, according to the text of the statute, whether the plan "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." Our court has never held that, to fall within subsection (ii), a plan must be designed for the purpose of paying retirement or post-termination income. Moreover, RBC's reading would render the entirety of subsection (ii) superfluous, an unacceptable result. *See United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (recognizing that "one of the most basic interpretative canons" is that a "statute should be construed so that effect is given to all its provisions,

7

No. 13-20213

so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (footnote omitted)).

In analyzing subsection (ii), we begin with the predicate—"results in a deferral of income." The Supreme Court had occasion recently to construe the ordinary meaning of the word "results" in *Burrage v. United States*, 134 S. Ct. 881 (2014). The Court explained that "[a] thing 'results' when it arises as an effect, issue, or outcome *from* some action, process or design." *Id.* at 887 (internal quotation marks and alterations omitted) (citing 2 The New Shorter Oxford English Dictionary 2570 (1993)).[4] Accordingly, subsection (ii) provides that a "plan" is a "pension plan" when a "deferral of income" arises as an "effect, issue, or outcome" from that plan. The remaining text of subsection (ii)—"by employees for periods extending to the termination of covered employment or beyond"—indicates that the employees must defer the income to the end of their employment or beyond.

Our precedent is in accord. *Murphy* involved an employer that, through a "plan," assigned its employees "royalty interest[s]" in a drilling project. *Murphy*, 611 F.2d at 572–73. We explained that the payments from the royalty interests did not result in a "deferral of income":

> The record before us does not establish that any deferral of income ensues from the plan; royalty is paid to the employee annually as

---

[4] The Court in *Burrage* was interpreting a drug crime statute. *See* 21 U.S.C. § 841(b)(1)(A)–(C) (providing for increased sentence "if death or serious bodily injury results from the use of [the controlled] substance"). The word "results" retains its ordinary meaning, regardless of whether it appears in Title 21 or Title 29 of the United States Code.

8

No. 13-20213

> it is received. . . . Under the statutory definition, therefore, the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage.

*Id.* at 575. The "mere fact" of post-termination payments was thus the sort of scenario around which we declined to stretch the "elastic girdle." *See id.* ("Any outright conveyance of property to an employee might result in some payment to him after retirement."). *Boos* built upon that interpretation. In *Boos*, we held that, to establish coverage via subsection (ii), employees "must show that they forewent income at some point in exchange for receiving income from [the plan] at a later date." *Boos*, 643 F.3d at 134. The plaintiffs in *Boos* were retirees who received reimbursements for their telephone expenses from their former telephone-company employer. *Id.* As a result, we held, the plaintiffs had no right to income until they purchased telephone services, and therefore, the plaintiffs had not foregone any income in exchange for receiving income at a later date. *Id.* at 134–35 (citing *Rathbun v. Qwest Commc'ns Int'l, Inc.*, 458 F. Supp. 2d 1238, 1248 (D. Colo. 2006) ("[T]he program reimbursements cannot be characterized as deferred income because employees and retirees have no entitlement to any funds until they have expended the reimbursable amount on telephone services.")). We analogized to *Murphy* in concluding that the nature of the reimbursements was "such that the beneficiaries are paid over time, as the right to the income is realized." *Boos*, 643 F.3d at 135.

We conclude that the plain language of the statute and the interpretations expressed in *Murphy* and *Boos* all compel one result: The WAP is a "pension plan" under subsection (ii). The WAP's "express terms" reveal themselves at the outset of the document. The first section of the WAP, the statement of purpose, refers to the WAP as a "deferred compensation plan" and explains that, by design, employees have the option "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan

9

Year." Later sections of the WAP contain provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly refer to income that is deferred. A deferral of income therefore "ensues from" (or, "arises as an effect of") the express terms of the WAP. *See Murphy*, 611 F.2d at 575. Put another way, by participating in the WAP, the plaintiffs have "fore[gone] income . . . in exchange for receiving income" at a later date. *See Boos*, 643 F.3d at 134.

The "express terms" of the WAP also contemplate employees deferring income "to the termination of covered employment or beyond." The vesting sections explain that, *upon separation*, unvested amounts vest immediately. The distribution sections contain further support: "If distribution is made due to Separation," then "[a]vailable forms of distribution include a single lump sum or, if a Participant meets the requirements for Retirement at the time of Separation, substantially equal annual installments for up to ten years." Accordingly, the WAP fits comfortably within the meaning of subsection (ii).[5]

In concluding that the WAP is a "pension plan," we reject RBC's arguments rooted in a Department of Labor regulation, 29 C.F.R. § 2510.3–2(c). That regulation provides:

> [T]he terms "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

*Id.* To begin, RBC admits that the WAP is not a "bonus program" under § 2510.3–2(c)—indeed, RBC never argued otherwise at the district court. For good reason: The WAP's statement of purpose provides that the WAP is a

---

[5] Grounding our decision in the WAP's "express terms" obviates any need to consider the "surrounding circumstances." *See* § 1002(2)(A).

10

No. 13-20213

"deferred compensation plan" allowing employees "to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year." This is not a bonus plan. *Cf. Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999) ("The [phantom stock plan] thus sets up a classic 'bonus' situation: reward (higher cash value [for the participants' shares]) for superior performance (higher corporate earnings).") RBC urges us nonetheless to apply the regulation's conditional clause—"unless such payments are systematically deferred"—to hold that the WAP is not a "pension plan." We decline to do so. The regulation is designed to "clarif[y] the limits of the defined terms 'employee pension benefit plan' and 'pension plan' . . . by identifying certain specific plans, funds and programs which do not constitute employee pension benefit plans." § 2510.3–2(a). The WAP is not among the "specific plans" identified in § 2510.3–2(c), and we therefore decline to require the WAP to satisfy the "systematically deferred" condition. In other words, the WAP fits comfortably within the meaning of § 1002(2)(A)(ii), and nothing in §2510.3–2(c) takes it out.

Reliance on *Emmenegger* is thus misplaced. RBC argues that, under *Emmenegger*, "the mere option to defer receipt of benefits until retirement or termination does not trigger ERISA coverage." RBC thus argues that the WAP's "option" to defer income means that ERISA does not apply. We have no quibble with *Emmenegger*; however, that case was premised on the conclusion that the plan at issue was a *bonus program* under 29 C.F.R. § 2510.3–2(c). *Emmenegger*, 197 F.3d at 932. The Eighth Circuit therefore reasoned that the option to defer the receipt of income did not bring the bonus program within § 2510.3–2(c)'s "systematically deferred" exception. *See Emmenegger*, 197 F.3d at 933 ("[T]he shares, or more accurately the redemption thereof, cannot be characterized as 'payments [that] are systematically deferred' to termination or 'so as to provide retirement income.'" (quoting § 2510.3–2(c)); *see also*

11

*McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993) ("The plan permits a sales representative to withdraw the vested portion of her/his allocations at any time during the course of her/his employment; it does not provide for the *systematic* deferral of payment."). Here, because the regulation does not apply, the cases applying that regulation are not persuasive. Furthermore, the WAP's option to defer income, which RBC characterizes as a "flexible benefit," does not change the fact that the "express terms" of the WAP "result[] in a deferral of income."[6]

B.

This case does not end with § 1002(2)(A)(ii). Although the district court did not reach the issue, RBC argues in its brief that, regardless of whether the WAP is a "pension plan," the WAP is an exempt "top hat" plan. A "top hat" plan is a plan that is (1) unfunded and (2) maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." § 1101(a)(1). Such a plan is exempt from the fiduciary duties imposed by ERISA. *Id.*; *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512 (5th Cir. 2002). The WAP itself contains a statement that RBC believes that the WAP "constitutes an

---

[6] We are aware of the various policy-based arguments presented in the *amicus* brief before us and at oral argument. *Amicus* and RBC argue that financial services firms face a problem with retaining financial advisors and that plans such as the WAP are designed to combat that problem. *Amicus* further argues that subjecting plans such as the WAP to ERISA would "eliminate a crucial employee-retention tool in the financial services industry." The financial services industry is free to decide what is best for the financial services industry. We decline, however, to engage in any policy debate that would affect how we interpret this statute. Indeed, "[i]t is not our role to do so." *United States v. O'Banion*, 943 F.2d 1422, 1433 (5th Cir. 1991). We instead apply ERISA as written. *See White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377 (5th Cir. 2003) ("Our role under the [Individuals with Disabilities Education Act] is purposefully limited. . . . [I]t is the narrow one of determining whether state and local school officials have complied with the Act."); *see also Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 626–27 n.9 (5th Cir. 2013) (declining to look beyond the plain text in interpreting the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010).

No. 13-20213

unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees and, therefore, exempt from many ERISA requirements." We do not decide whether it is or is not. The resolution of the dispute over the "top hat" exemption may require factual determinations regarding, for example, selectivity and high compensation. The district court is best equipped to decide this issue in the first instance.

REVERSED and REMANDED.