# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA TOLBERT, et al., | § § | |
| Plaintiff | § § | No. 4:11-CV-107 |
| v. | § § | Judge Keith P. Ellison |
| RBC CAPITAL MARKETS CORPORATION n/k/a RBC CAPITAL MARKETS, LLC, ET AL., | § § § § | |
| Defendants. | § § | |

# [*PROPOSED*] PROCEDURAL BACKGROUND AND CONCLUSIONS OF LAW

## I.   PROCEDURAL BACKGROUND

On January 11, 2011, plaintiff Brenda Tolbert filed the initial Complaint in this matter, alleging that Defendants RBC Capital Markets, LLC (formerly known as RBC Capital Markets Corporation), RBC Bank (USA) (formerly known as RBC Centura Bank), and RBC Insurance Services, Inc. ("RBC" or "Defendants"), improperly "forfeited" certain purportedly "vested benefits" to which she claims she was entitled under the Royal Bank of Canada Wealth Accumulation Plan (the "WAP").  Dkt. 1.  In particular, Tolbert alleged that the WAP did not satisfy the requirements of a valid "top hat" plan, exempt from most of substantive provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq. Id.*

On April 7, 2011, Tolbert filed a First Amended Class Action Complaint, again seeking to recover "all vested accrued WAP benefits" that were (or may be) "forfeited" under the terms of the WAP.  Dkt. 24.

On April 27, 2011, Tolbert filed her first Motion for Class Certification, seeking certification of her claims under Federal Rule of Civil Procedure 23(b)(1), (2), or (3).  Dkt. 31.

The parties filed various briefs in support of and opposition to that motion.  Dkts. 45, 46, 50, 55, 58, 76.  The Court denied Tolbert's first Motion to Certify Class on March 28, 2012.  Dkt. 97.

On December 16, 2011, Tolbert filed a Motion for Partial Summary on the issue of whether the WAP met the requirements of an exempt ERISA top hat plan.  Dkt. 84.  On January 26, 2012, RBC filed a Motion for Summary Judgment on all of Tolbert's claims.  Dkt. 91.  The parties filed various briefs and supplements in support of their positions.  *See* Dkt. 174 at 1.

On March 29, 2012, plaintiffs Joseph Neuhaus, Jr. and Lawrence Gift, Jr. joined this lawsuit, and both plaintiffs expressly adopted all pleadings, motions, and arguments previously filed and raised by Tolbert.  Dkts. 94, 98.

On March 27, 2013, the Court granted RBC's motion for summary judgment, finding the WAP was not an "employee pension benefit plan" governed by ERISA.  Dkt. 146.  The Court therefore did not rule on the remaining issues.  Plaintiffs appealed, and the Fifth Circuit reversed on July 14, 2014, remanding to the Court for further proceedings.  Dkts. 163, 164.

On August 5, 2014, Plaintiffs filed a "First Amended and Re-Urged Motion for Class Certification."  Dkt. 162.  The parties fully briefed this motion.  Dkts. 175, 179.

On April 28, 2015, the Court ruled on the parties' pending cross-motions for summary judgment, with respect to the issue of whether the WAP was a valid top hat plan under ERISA.  Dkt. 174.  The Court denied Plaintiffs' partial motion for summary judgment, and denied RBC's motion for summary judgment in part, to the extent it sought summary judgment holding that the WAP was a valid top hat plan under ERISA.  *Id.* at 1, 21.  The Court reserved its rulings on the remainder of RBC's Motion for Summary Judgment, taking those issues under advisement for disposition in a separate order.  *Id.* at 21.

On May 26, 2016, the Court issued its ruling on Plaintiffs' "First Amended and Re-Urged

Motion for Class Certification," as well as its decision on the outstanding issues raised by RBC's Motion for Summary Judgment. Dkt. 186. First, the Court denied Plaintiffs' class certification motion, finding that Plaintiffs failed to satisfy the requirements of both Rule 23(a) and (b). *Id.* at 16-17. Second, the Court denied all of RBC's remaining grounds for its Motion for Summary Judgment, finding genuine factual disputes requiring a trial. *Id.* at 30.

On June 3, 2016, following the Court's summary judgment and class certification rulings and after a review of the record in light of those rulings, all Plaintiffs and the RBC Defendants (collectively, the "Parties") reached an agreement to settle the named Plaintiffs' individual claims. The Parties notified this Court of its agreement on June 28, 2016, and Defendants submitted to this Court the Parties' Stipulated Findings of Fact on the same date, citing record evidence in support thereof. This Court accepts these Stipulated Findings of Fact as true for purposes of reaching the following Conclusions of Law.[1]

II.     **CONCLUSIONS OF LAW**

     A.     **Whether The WAP Is A Top-Hat Plan Under ERISA Is A Question Of Law.**

     1.     Plaintiffs allege that RBC improperly forfeited certain amounts in their WAP accounts after they were terminated from RBC for cause, in particular because the WAP did not satisfy the requirements of a valid top-hat Plan exempt from ERISA vesting, funding, and anti-forfeiture provisions. Dkt. 24, Am. Compl. ¶¶ 115-120. Plaintiffs allege that such conduct constituted a breach of Defendants' fiduciary duties, 29 U.S.C. § 1132(a)(2), and also represents a basis for equitable relief under ERISA, *id.* § 1132(a)(3). *Id.* The Parties do not dispute that if the WAP satisfied ERISA's top-hat exemption, the WAP's forfeiture provisions—and thus the forfeitures with respect to each Plaintiff—were valid, and Plaintiffs' claims will fail. *See id.* ¶¶ 30-31. RBC denies the WAP failed to qualify as a top hat Plan under ERISA at any time.

---

[1] The Parties' Stipulated Findings of Fact are cited herein as "Facts ¶ __."

*See, e.g.*, Dkt. 99, Ans. ¶¶ 67-71, 113-116.

  2. As there are no material facts remaining in dispute, whether the WAP was a valid top hat Plan under ERISA is a question of law for the Court. *See* Dkt. 174 at 6 (citing *Carrabba v. Randalls Food Markets, Inc.*, 38 F. Supp. 2d 468, 472 (N.D. Tex. 1999)).

  B. **The WAP Is A Valid Top Hat Plan.**

  3. A "top hat" plan is an ERISA plan that is unfunded and maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1). Such a plan is exempt from most substantive provisions of ERISA, including its fiduciary duty, vesting, and anti-forfeiture requirements. *See* Dkt. 174 at 5 (citing *Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 512 (5th Cir. 2002)).

  4. The Court therefore must determine whether the WAP was (1) "unfunded"; (2) offered for the primary purpose of providing deferred compensation; and (3) maintained for a "select group of management or highly compensated employees" during the relevant years. Dkt. 174 at 6. The Court also addresses below a fourth potentially relevant factor in determining the WAP's top hat status, that is, whether a significant number of WAP participants had the ability to bargain for or "substantially influence" the terms or administration of the WAP. As explained below and in the Court's previous ruling on the Parties' cross-motions for summary judgment, the Court is skeptical that such a determination is an independent element to establishing ERISA's top hat exemption, but the Court need not make that determination in this case. *See* Dkt. 174 at 10-16, *infra* at ¶¶ 24-28.

  1. **The WAP Is Unfunded.**

  5. The Parties stipulate that the WAP is unfunded. Facts ¶ 10. The Court agrees, finding that the available evidence demonstrates that the WAP is not funded by a res separate

4

from RBC's general assets, and Plaintiffs possess no right to their WAP balances greater than that of an unsecured creditor. *Id.* The Court therefore finds that the WAP is unfunded for purposes of the top-hat analysis. *See Reliable Home Health Care*, 295 F.3d at 513-14.

        2.       **The WAP's Primary Purpose Was To Offer Deferred Compensation.**

    6.       The Court's previous ruling on the Parties' cross-motions for summary judgment on the top hat issue articulated the standards for determining whether the WAP's "primary purpose" was to provide deferred compensation to WAP participants, and the Court rejected Plaintiffs' position that the WAP's "primary purpose" for this analysis was to recruit, develop, and retain employees highly valuable to RBC, as opposed to offering such employees deferred compensation. Dkt. 174 at 7-9. That discussion is incorporated by reference.

    7.       Having reviewed the Parties' Stipulated Findings of Fact, in addition to the record evidence cited in the Court's previous ruling, the Court finds that RBC maintained the WAP "primarily for the purpose of providing deferred compensation" to WAP participants. Facts ¶¶ 3-5; *see also* Dkt. 174 at 8-9 (quoting *Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 142-43 (D. Mass), *aff'd*, 513 F.3d 37 (1st Cir. 2008)).

        3.       **The WAP Was Limited To A Select Group Of Management Or Highly Compensated Employees.**

    8.       ERISA provides no specific definitions or guidelines for determining whether a purported top hat plan is limited to a "select group of management or highly compensated employees." *See* Dkt. 174 at 17. In making this determination, a number of courts have considered a variety of qualitative and quantitative factors with respect to the plan at issue, including the percentage of the total workforce eligible to participate in the plan; (2) the compensation disparity between the top hat plan members and non-members or the workforce as a whole; (3) the nature of the top hat plan members' employment duties; and/or (4) the language

5

of the plan document. *Id.* (citing *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 43-47 (1st Cir. 2008); *Bakri v. Venture Mgf. Co.*, 473 F.3d 677, 678 (6th Cir. 2007); *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 288-90 (2d Cir. 2000); *Duggan v. Hobbs*, 99 F.3d 307, 312 (9th Cir. 1996)).

9. The Court considers these factors holistically, and no one factor requires more weight than any other factor in determining whether the WAP satisfies the top hat exemption. Dkt. 174 at 17-18.

### a. **The WAP Is Quantitatively Selective, Favoring Top-Hat Status.**

10. As the Court has already found, by its own terms, the WAP is a plan in which certain employees of the Royal Bank of Canada and its "Participating Subsidiaries" may participate, if eligible. Dkt. 174 at 18. Thus, the relevant employee pool or "workforce" for purposes of these proceedings would be the employees of the Royal Bank of Canada and its "Participating Subsidiaries." *Id.*

11. Between 2004 and 2010, the total percentage of all Plan sponsor employees who were eligible for the WAP ranged from 1.97% to 3.31%, with an average annual eligibility percentage of just 2.84%. Facts ¶ 13.

12. Although there is no bright-line threshold at which point a plan becomes over-inclusive and, therefore, insufficiently "selective" for purposes of ERISA's top hat exemption, this level of participation in the WAP is significantly below the thresholds applied in other cases addressing this issue. *Compare Demery*, 216 F.3d at 289 (holding that 15.34% is within "the acceptable size for a 'select group'") *and Alexander*, 513 F.3d at 44 (same where 8.7% of all plan sponsor employees were eligible) *and Callan v. Merrill Lynch & Co., Inc.*, 2010 WL 3452371, at *10 (S.D. Cal. Aug. 30, 2010) (agreeing with the general 15% threshold courts often

6

apply), *with Darden v. Nationwide Mut. Ins. Co.*, 717 F. Supp. 388, 397 (E.D.N.C. 1989) (plan not sufficiently select where, over a four year period, 18.7% of all plan sponsor employees were eligible), *aff'd* 922 F.2d 303 (4th Cir. 1991), *rev'd on other grounds*, 503 U.S. 318 (1992).

13.     The Court therefore finds that participation in the WAP was limited to a quantitatively "select" group of the WAP's plan sponsor employees in all relevant years, and this factor weighs in favor of finding the WAP to be a valid top hat plan under ERISA.

### b. **The WAP Is Qualitatively Selective, Favoring Top-Hat Status.**

14.     ***"Highly Compensated" Employees.***  Turning to the qualitative characteristics, to determine whether the WAP is offered to primarily "highly compensated" employees, the Court compares the compensation of those employees who satisfy the WAP's eligibility requirements to the compensation of either the workforce as a whole, or to those employees not eligible for the WAP.  *See* Dkt. 174 at 17; *compare Demery*, 216 F.3d at 289 ("[T]he average salary of plan participants was more than double that of the average salary of all [bank] employees. We find this did make them 'highly compensated'[.]"), *with Daft*, 658 F.3d at 595 (stating that the relevant analysis is "the compensation disparity between top hat plan members and non-members" (emphasis added)), *and Callan*, 2010 WL 3452371, at *11 (applying both tests but endorsing the latter).

15.     Although, again, no single approach or threshold is determinative, courts have held that a plan meets the "highly compensated" requirement where the average compensation of eligible employees exceeds that of the plan sponsor's entire workforce by a ratio of 2:1 or more, *see, e.g.*, *Demery*, 216 F.3d at 289; *Callan*, 2010 WL 3452371, at *11, or exceeds the compensation of the non-eligible employees of the plan sponsor's workforce by a ratio of 3:1 or more. *See, e.g.*, *Callan*, 2010 WL 3452371, at *11.

16. Under either approach, and using either the mean or median salary figures, the Court finds that participation in the WAP was limited to "highly compensated" employees. For Plan years 2004 through 2010, the median compensation of WAP-eligible employees was between 5.2 and 7.2 times (on average 6.2 times) greater than that of all Plan sponsor employees, resulting in compensation of WAP-eligible employees over this period being greater than that of at least 94% of all Plan sponsor employees. Facts ¶ 14. Over that same period, the average compensation of WAP-eligible employees was between 4.0 and 5.5 times greater than that of all Plan sponsor employees, putting the average compensation of WAP-eligible employees above the compensation of at least 96% of all Plan sponsor employees. *Id.* ¶ 15.

17. Not surprisingly, the disparity grows when comparing WAP-eligible employees to those who were not eligible to participate in the WAP. From 2004 through 2010, the median compensation for all WAP eligible employees was between 5.3 and 7.4 times (on average 6.3 times) greater than that of all non-eligible Plan sponsor employees, while over the same period, the average compensation of all WAP-eligible employees was between 4.7 and 6.5 times greater than that of all Plan sponsor employees. Facts ¶¶ 16-17.

18. The Court therefore finds that the WAP was sufficiently selective and maintained for the primary benefit of highly compensated employees, and this factor supports the WAP's valid top hat status under ERISA.

19. ***"Management" Employees***. Although only a limited number of WAP participants over the relevant time period were eligible based solely upon their position or job title alone (as opposed meeting the minimum compensation thresholds and, therefore, qualifying as "highly compensated"), the Court also finds that the nature of those employees' responsibilities and job duties support the WAP's status as a valid ERISA top hat plan.

20. Courts have made clear that a valid top hat plan need not be limited strictly to a company's "narrow range of top executives," but rather may include "highly valued managerial employees," which might include employees in positions such as "assistant vice presidents and branch managers." *Demery*, 216 F.3d at 289.  Rather, in those cases finding a plan did not to satisfy the selectivity requirement, and unlike here, participation typically is "offered to employees at widely varying levels." *Id.*  Moreover, as the Court observed in its previous ruling, even if a small number of WAP participants might not qualify as "high ranking," this does not automatically negate the WAP's top hat status.  Dkt. 174 at 19 (citing *Demery*, 216 F.3d at 289).

21. Here, the Court finds that the few categories of employees potentially eligible for the WAP based on their position or job title were properly limited to a select group of "management."  These employees included vice presidents, business line presidents and directors, and complex, branch, and regional directors, each of whom had high-level leadership and upper management responsibilities.  Facts ¶¶ 24-25.  This factor therefore also weighs in favor of finding that the WAP was a valid top hat plan under ERISA.

c. **The WAP's Language Supports Finding Top-Hat Status.**

22. In addition to the factors above, some courts evaluate the "actual language of the plan" to determine whether it is consistent with ERISA's top hat requirements.  *See, e.g.*, *Daft*, 658 F.3d at 595.

23. Here, the Court finds that the WAP's plain language is fully consistent with the top hat requirements.  In particular, Section 1.1 of the WAP essentially tracks the top hat exemption, expressly stating that the WAP is a "deferred compensation plan" offered only to "a select group of management or highly compensated employees."  Facts ¶ 3.  Section 5.11 further states that, to the extent the WAP is found to be covered by ERISA, it is designed to "constitute[]

9

an unfunded plan of deferred compensation maintained for a select group of management or highly compensated employees[.]" *Id.* Accordingly, the Court finds that this factor also weighs in favor of finding that the WAP is a valid top hat plan.

### 4. **To The Extent Necessary, The Plaintiffs Had The Ability To Affect Or Substantially Influence The Design And Operation Of The WAP.**

24. During litigation of this case, Plaintiffs have argued that the WAP must satisfy an additional element: that each WAP participant had the ability to individually bargain for the terms of the plan and/or exert "substantial influence" over the terms and provisions of the WAP. The Court addressed this contention at length in its ruling on the Parties' cross-motions for summary judgment on the top hat issue, which the Court incorporates herein. Dkt. 174 at 10-16. In short, the Court concluded that under the relevant authorities, "it would appear that the 'substantial influence' or 'bargaining power' issue may be, at most, a part of the overarching 'selectivity' factor, and not a separate, independent test for purposes of the top hat exemption." *Id.* at 13. Moreover, the Court expressly "reject[ed] any argument that *each participant* must meet a 'substantial influence' standard" on an individual basis, but rather to the extent that a "substantial influence" factor is relevant at all, it means "that a significant number of WAP participants individually had the required bargaining power." *Id.* at 15 (emphasis added).

25. The Court need not resolve the question of whether a separate "substantial influence" element is required because, to the extent it is, the Court finds that the WAP participants meet this standard. The pertinent question, as outlined in the Court's previous ruling, is whether the WAP's participants are "better equipped than ordinary pension plan participants to effectively protect their interests in their employee benefits bargaining process," meaning that, "by virtue of their positions or compensation level, [they] have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their

deferred compensation plan." *Id.* at 12 (quoting *Spacek v. Maritime Assoc.*, 134 F. 3d 283, 296 n.12 (5th Cir. 1998) and DOL Op. Ltr. 90-14A).

26. In light of the Parties' Stipulated Facts, the Court concludes that a significant number of WAP participants individually had the requisite bargaining power to satisfy the "substantial influence" standard, to the extent it applies. WAP participants—in particular well-performing Financial Consultants, which comprise the WAP's largest group—are exceedingly valuable and highly compensated employees who represent the lifeblood of RBC's business and create substantial revenue generation for RBC. Facts ¶ 19. These employees were highly recruited by RBC's competitors, offered substantial bonuses to switch employers, and typically took the vast majority of their clients with them if they chose to leave RBC, not to mention other RBC employees. *Id.* ¶¶ 19-21; *see also, e.g.*, *Alexander*, 467 F. Supp. 2d at 147 ("[T]he [plan] was established as a result of the threat that a very profitable [employee] would leave [the employer] for a more lucrative position. This indicates that successful [employees] have both options and bargaining power"). The WAP served as a central component of these employees' compensation structure, including the repository for their substantial annual bonuses and deferred compensation over and above deferrals permitted under RBC's 401(k) Plan. Facts ¶ 22;

27. The WAP therefore was an integral part of RBC's ability to attract and retain these key employees, and similar deferred compensation programs are offered by RBC's competitors. Facts ¶¶ 22-23. RBC thus reviewed the WAP regularly and made various changes over time to tailor the WAP to its participants and ensure it remained a competitive benefit, actions reflecting the bargaining power these employees possess. *Id.* For those WAP participants other than Financial Consultants, their positions involve executive or high-level managerial responsibilities that indicate they possess the sophistication and bargaining power to

influence the WAP's terms, should they choose to exercise it. *Id.* ¶¶ 24-25. Moreover, the evidence reflects that WAP participants have, in fact, effectuated some changes to the WAP's terms and administration. Facts ¶ 23.

28. The Court therefore concludes that even if the "substantial influence" factor is relevant to the top hat analysis, the WAP satisfies this standard. This factor therefore also weighs in favor of finding that the WAP is a valid top hat plan under ERISA.

III. **THE WAP IS A VALID TOP HAT PLAN UNDER ERISA.**

29. Having reached the legal determinations above, and in light of the Parties' Stipulated Facts, the Court concludes that, at all relevant times, the WAP was a valid top hat plan, in that it was "maintained by [RBC] primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1101(a)(1). Accordingly, the Court finds that the WAP is exempt from many of ERISA's substantive provisions, including the breach of fiduciary duty, vesting, and anti-forfeiture provisions upon which Plaintiffs' claims in this case are based. *Id.*

Signed at Houston Texas, on this the ____ day of _____, 2016.

 

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE